2003 WY 77

Dean GREENWALT; Lizabeth Greenwalt; Rachel Greenwalt, a minor, by Dean Greenwalt, her conservator; and Dean Greenwalt, as personal representative for the Estate of John Douglas Greenwalt, Deceased, Appellants (Plaintiffs),

v.

RAM RESTAURANT CORPORATION OF WYOMING, a Wyoming corporation, d/b/a C.B. & Potts & Big Horn Brewing Company; Cheyenne 28, LLC, a Washington Limited Liability Company; and John Does 1–5, Appellees (Defendants).

No. 01–103.

Supreme Court of Wyoming.

June 26, 2003.

Rehearing Denied July 24, 2003.

John B. "Jack" Speight, Robert T. McCue, and Ian D. Shaw of Hathaway, Speight & Kunz, LLC, Cheyenne, Wyoming, Representing Appellant. Argument by Messrs. Speight and Shaw.

Thomas G. Gorman, Richard A. Mincer, and Ryan T. Schelhaas of Hirst & Applegate, P.C., Cheyenne, Wyoming, Representing Appellee. Argument by Mr. Mincer.

Before HILL, C.J., and GOLDEN, LEHMAN *, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] In response to a complaint asserting a wrongful death and negligence claim against Appellees' restaurant and bar, the district court certified a question of law concerning the constitutionality of a statute that limits a liquor vendor's liability when that vendor has legally provided alcohol to another. The statute at issue, Wyo. Stat. Ann. § 12–8–301 (LexisNexis 2001), provides that no person who has legally provided alcoholic liquor or malt beverage to any other person is liable for damages caused by the intoxication of the other person. Appellants (Greenwalts) are the family of John Douglas Greenwalt (Mr. Greenwalt) and the personal representative of his estate, and they contend that this statute violates the equal protection and due process rights provided by both the United States and the Wyoming Constitutions and further violates the open courts provision found in the Wyoming Constitution.

[¶ 2] We hold that § 12–8–301 does not infringe upon the fundamental right of access to the courts declared in Article 1, Section 8 of the Wyoming Constitution, and that § 301 does not infringe upon any other fundamental interest and does not create an inherently suspect classification as alleged by the

* Chief Justice at time of oral argument.

Greenwalts. Based upon a review of § 301 under this Court's rational basis test, we conclude that § 301 does not violate the equal protection guarantees of either the United States or Wyoming Constitutions.

## CERTIFIED QUESTION

[¶ 3] Is Wyo. Stat. Ann. § 12–8–301 unconstitutional?

## FACTS

[¶ 4] Mr. Greenwalt died in a motor vehicle accident caused by Quay Sampsell. Appellee Ram Restaurant Corporation of Wyoming (Ram) operated a restaurant and bar in Cheyenne, Wyoming, called C.B. & Potts & Big Horn Brewing Company (restaurant). On the night of the accident, Sampsell purchased alcohol in the restaurant's bar, and later, while driving his vehicle, collided with Mr. Greenwalt's vehicle, killing Mr. Greenwalt. After the accident, Sampsell's blood alcohol level tested at .217. *Sampsell v. State*, 2001 WY 12, ¶ 3, 17 P.3d 724, ¶ 3 (Wyo.2001).

[¶ 5] Greenwalts sued Ram for wrongful death and negligence, contending that it was the sales and service of alcohol to Sampsell that was the direct and proximate cause of Mr. Greenwalt's death. Ram filed a motion to dismiss denying liability pursuant to § 12–8–301. The parties jointly filed for certification of the constitutional issue and, on June 19, 2001, this Court granted certification of the question presented.

## DISCUSSION

*Parties' Contentions*

[¶ 6] Greenwalts contend that § 12–8–301 is special legislation that violates both the state and federal constitutional guarantees of equal protection, due process, and access to the courts by treating victims of liquor vendor negligence differently from all other tort victims. Greenwalts argue that this class of victims is statutorily prohibited from receiving redress in a Wyoming court of law because they believe that § 301 grants immunity to liquor vendors. Claiming that the open courts provision is violated by any statute

that bars a victim of negligence from bringing suit in Wyoming courts, Greenwalts reason that the statute violates the fundamental right to access the courts and due process protections. Greenwalts further contend that by violating the fundamental right of access to courts, the legislatively created classification requires strict scrutiny review, and that review reveals that it does not serve any compelling state interest and is, therefore, unconstitutional.

[¶ 7] In response, Ram contends that the statute is neither special legislation that provides absolute immunity to liquor vendors nor a law that abolishes a well-recognized common law cause of action. Noting that the common law rule is one of non-liability for liquor vendors, Ram asserts that the statute modifies this non-liability rule by creating a cause of action against those persons violating the extensive mandates governing sales and service of alcoholic beverages found in Title 12 of the Wyoming statutes. Ram states that the purpose of the open courts provision is to guarantee access to the courts for the administration of justice for recognized rights that have a known remedy and argues that the Greenwalts' contentions concerning the open courts provision amount to a request that this Court determine that there is a fundamental right to sue anyone who allegedly causes injury or death. Ram warns that such a determination would remove all limitations from tort actions and preclude the legislature from altering, repealing, or restricting the common law within constitutional bounds.

[¶ 8] Our treatment proceeds along the following lines. First, it reviews this Court's past common law decisions involving liquor vendor liability because they provide an important historical and analytical backdrop for consideration of the constitutional questions. Next, it reviews the nature and scope of the legislative department's exercise of its police power in its central law-making role under our form of government. Then, it explains the legislative department's exercise of its police power in its 1985 enactment and subsequent 1986 amendment of § 301 which codified and then expanded the common law decisions of this Court thus creating a statu-

tory tort cause of action for victims of the tortious behavior of intoxicated consumers unlawfully furnished intoxicating liquor by liquor providers. It parses § 301 and explains its elements. Next, it reviews the heavy burden that must be carried by a litigant who challenges the constitutionality of a statute. In this review, we identify and comment on the pertinent court access and equal protection guarantees located within the provisions of the United States and Wyoming Constitutions. Next, it reviews the elements of the rational basis test used in equal protection analysis. Finally, it applies those elements to § 301 in order to determine whether that section passes or fails equal protection muster.

[¶ 9] As we begin our review, we accept, as do all members of the judicial department, that decision-making in response to a constitutional challenge to a product of the legislative and executive departments of our state government is a burden profoundly felt by the judicial department which is invested under our constitution with the responsibility to resolve the challenge. This Court cannot refuse to bear that burden. Such is the special nature of the judicial enterprise. Of that, Justice Stephen Breyer has written

> [t]hat enterprise, Chief Justice Marshall explained, may call upon a judge to decide "between the Government and the man whom that Government is prosecuting; between the most powerful individual in the community and the poorest and most unpopular." Independence of conscience, freedom from subservience to other Government authorities, is necessary to the enterprise.

*Williams v. United States,* 535 U.S. 911, 921, 122 S.Ct. 1221, 1227, 152 L.Ed.2d 153 (2002) (Breyer, J., dissenting, with whom Scalia and Kennedy, JJ., join) (citation omitted). As Justice Breyer explains, judges, who are often called upon to answer our society's thorniest legal questions where a constitution demands it, should not be moved by potential adverse public opinion, whichever way it might cut. *Id.* at 919, 122 S.Ct. at 1226. Whenever a court considers a matter where public sentiment is strong and emotions are high, it risks public alienation. *Id.* However,

the Wyoming public has understood the need and importance of judges deciding important constitutional issues without regard to such considerations. In the final analysis, this Court has the non-transferable responsibility and the unavoidable obligation to decide. *Id.*

*The Court's Past Decisions*

[¶ 10] "We presume the legislature enacts statutes with full knowledge of the existing condition of the law and with reference to it." *Almada v. State,* 994 P.2d 299, 306 (Wyo.1999).

[¶ 11] In *Parsons v. Jow,* 480 P.2d 396 (Wyo.1971), this Court affirmed the district court's order which dismissed the tort claim of Parsons, an underage passenger in an automobile operated by McCall, also underage, asserted against Jow, the owner of a bar, whose employee had sold intoxicating liquor to the underage McCall. McCall had consumed the liquor, become intoxicated, and driven his automobile into a school building, causing permanent injuries to Parsons. Affirming the district court's order that Parsons' complaint against Jow had failed to state a legally cognizable tort claim upon which relief could be granted under Wyoming tort law, this Court recognized and applied the common law rule that no cause of action existed "against a vendor of liquor in favor of one injured by a vendee who becomes intoxicated—this for the reason that the proximate cause of the injury was deemed to be the patron's consumption of liquor and not its sale." *Id.* at 397. Parsons had apparently argued that a Wyoming statute, then § 12–33, W.S.1957, 1969 Cum. Supp., made unlawful the sale of liquor to an underage person; that the statute established a civil duty of care owed by the liquor vendor to a third-party like Parsons; and that the liquor vendor's violation of the statute, and thus the duty of care, was either negligence per se or evidence of the liquor vendor's negligence. *Id.* This Court rejected that argument because, even assuming the liquor vendor's violation of the statute (duty), the statutory violation (duty breach) "would not be a proximate cause of injury." *Id.* In conclusion, this Court noted that modification of the common law rule of civil non-liability of the liquor vendor was "within the province

of the legislature." *Id.* at 398. Following this decision, the Wyoming legislature did not address the subject.

[¶ 12] Twelve years later, this Court decided *McClellan v. Tottenhoff,* 666 P.2d 408 (Wyo.1983). In that case, "[t]he sole issue on appeal [was] whether a complaint against a vendor unlawfully selling liquor to a minor [in his automobile at a liquor drive-in facility] who becomes intoxicated and injures a third-party states a claim for relief in Wyoming." *Id.* at 409. The McClellans' complaint alleged that the liquor vendor's employee, making no effort to check the identification of James Staatz, a 17–year–old who looked young, negligently sold liquor to Staatz who was in his automobile at the liquor vendor's drive-in window; Staatz became intoxicated and killed Chad McClellan in an automobile accident. *Id.* at 409, 414. Relying upon *Parsons,* the district court had dismissed the McClellans' complaint for failure to state a legally cognizable tort claim under Wyoming law. *Id.* at 409. Thinking that statements in *Parsons* concerning the legislature's province and proximate cause had misconstrued the nature of the common law, this Court overruled *Parsons.* *Id.* at 410. Relying upon the common law's inherent dynamic principle which allows the judicially-created common law to grow and to tailor itself to meet society's changing needs and relying upon the reasoning of common law decisions from courts in Illinois, Idaho, Indiana, Minnesota, New Jersey, and Oregon, this Court as a common law court established a liquor vendor's common law duty of reasonable care owed to third-parties injured by an intoxicated underage vendee. *Id.* at 411–12. In legal effect, then, this Court established a common law tort claim upon which relief could be granted against a liquor vendor and in favor of an injured third-party. This Court based the liquor vendor's duty of reasonable care upon both §§ 12–5–301(a)(v) and 12–6–101(a), W.S.1977. *Id.* at 412–13. Section 12–5–301(a)(v) proscribed as a misdemeanor a liquor licensee's receiving a liquor order from or making a liquor delivery to a minor or an intoxicated person in a drive-in area of the licensed premises. Section 12–6–101(a) proscribed as a misdemeanor a liquor provider's furnishing of liquor to an under-age person who was not the liquor provider's legal ward, medical patient, or immediate family member. *Id.* at 413. This Court held that violation of either section was evidence of negligence. *Id.* Addressing the element of proximate cause, this Court noted that that element's well-settled meaning in negligence law was appropriate in the context of a violation of either a non-statutory or statutory duty, the ultimate test being whether the liquor licensee could foresee injury to a third-party, which was a question of fact. *Id.* at 414.

[¶ 13] Paying careful attention to this Court's analysis in *McClellan,* one is struck by the close connection between the operative allegations in the complaint—a liquor vendor selling intoxicating liquor to an underage patron in his automobile at the vendor's drive-in area—and this Court's seizing upon the statutory prohibitions against selling intoxicating liquor to an underage person (§ 12–6–101(a)) and to an underage person or an intoxicated person in the vendor's drive-in area (§ 12–5–301(a)(v)) in order to create a common law tort claim. Recognizing this close connection between the complaint allegations and the statutory proscriptions, one can confidently and reasonably conclude that the *McClellan* holding was narrow. This conclusion finds support in this Court's identification in that decision of the two ways in which society is harmed by the old common law rule of liquor vendor non-liability. *Id.* at 415. The first way is that the old non-liability rule "limits recovery when an intoxicated minor driver injures someone;" liquor vendors "are usually in a more solid financial position than a minor." *Id.* The second way is that the old non-liability rule deprives society of an "effective deterrent to keep liquor vendors from selling liquor to minors or to intoxicated persons." *Id.* This latter reference was obviously made with § 12–5–301(a)(v) in mind because it is that section which proscribes a liquor vendor's selling liquor to an intoxicated person at the vendor's drive-in area. In other words, this Court was stating that the non-liability rule harmed society by limiting compensation to injured third parties and by failing to deter undesirable conduct. As a

leading authority of tort law instructs, "[t]he most commonly mentioned aims of tort law are (1) compensation of injured persons and (2) deterrence of undesirable behavior." Dan B. Dobbs, *The Law of Torts* § 8, at 12 (2000).

[¶ 14] *McClellan's* narrow holding is best seen, therefore, as a common law court's effort to cure the public mischief of the harm done to society by liquor vendors' selling intoxicating liquors to underage persons and intoxicated persons at the vendors' drive-in areas. The opinion is an excellent example of a common law court's abrogation by judicial decision of an old common law rule in order to shape social policy. In the absence of legislative activity, such judicial activity is arguably an appropriate role for a common law court in our democratic society. When the judiciary abrogates a common law rule created by the judiciary in the first place, as was done in *McClellan,* the judiciary is changing the common law because that change is suitable to new circumstances or conditions, the needs of society, and because the old common law rule is perceived by the judiciary to conflict with public policy. *Adkins v. Sky Blue, Inc.,* 701 P.2d 549, 551 (Wyo.1985). Indeed, as this Court pointed out in *Adkins,* in *McClellan* this Court was declaring "public policy" and "the purposes to be served" by the new judicially-created tort claim of liquor vendor liability to third parties. *Id.* at 553. In deciding that *McClellan* would not be applied retroactively, this Court said that retroactive application of the new rule would not promote "[t]he stated public policy" of that new rule. *Id.*

[¶ 15] That common law courts, in the absence of legislative activity, make and shape public policy in cases like *McClellan* should come as no surprise. In numerous cases, this Court has enumerated the several factors of public policy which this Court considers when contemplating a judicial abrogation or modification of an existing common law rule. For example, in *Gates v. Richardson,* 719 P.2d 193 (Wyo.1986), in

contemplating extending a limited duty of care to persons who suffer mental distress upon observing a family member's severe injuries at the scene of an accident, this Court quoted favorably from a leading authority of tort law when it said that duty "is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id.* at 196 (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 54, at 357–58 (5th ed.1984)). This Court then enumerated some of the key policy factors to be considered by a court:

> (1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved.

*Gates,* 719 P.2d at 196. For other recent examples, *see also Andersen v. Two–Dot,* 2002 WY 105, ¶ 44, 49 P.3d 1011, ¶ 44 (Wyo. 2002); *Ortega v. Flaim,* 902 P.2d 199, 203 n. 3 (Wyo.1995); *Dellapenta v. Dellapenta,* 838 P.2d 1153 (Wyo.1992); *Nulle v. Gillette–Campbell County Joint Powers Fire Bd.,* 797 P.2d 1171 (Wyo.1990); *Mostert v. CBL & Assoc.,* 741 P.2d 1090, 1094 (Wyo.1987); and *Tader v. Tader,* 737 P.2d 1065 (Wyo.1987).

[¶ 16] It is elementary that public policy considerations are not the exclusive province of the judicial department. The legislative department of our state government lives and works in that province, too, because it exercises plenary legislative power. Wyo. Const. art. 2, § 1 (separation of powers); art. 10, § 2 (the police power of the state); and art. 19, § 10 (manufacture, sale and keeping for sale intoxicating liquor permitted in the state under such regulation as the legislature may prescribe).[1]

---

1. Indeed, some former members of this Court strongly expressed the view that the legislative department is more legitimately positioned and better able in our form of government than the

judicial department to consider our society's social problems, marshal appropriate information, identify relevant public policy factors, and enact laws expressing the public will about the appro-

[¶ 17] Following this Court's publication of *McClellan,* the Wyoming legislature became active in this province of public policy considerations surrounding the particular social problem narrowly addressed in that case. In the General Session of the Forty–Eighth State Legislature, which convened in January 1985, Representative Thomas Jones introduced House Bill No. 0390, an act to create Wyoming statute § 12–8–301 relating to alcoholic beverages and limiting causes of action in cases of voluntary intoxication in some cases. Dig. of House J., Forty–Eighth State Legis., Gen. Sess., at 416 (1985). Winding its way through the legislative process, the bill was passed by both the House and the Senate and was signed by the Governor, becoming effective May 23, 1985, as 1985 Wyo. Sess. Laws ch. 205, § 1. It became Wyoming statute § 12–8–301 in its enacted form. Before we closely examine its provisions and compare the tort claim thus legislatively created with that judicially created tort claim in *McClellan,* we pause to explain the nature and scope of the legislative department's exercise of its constitutionally-secured police power.

*The Legislative Department's Police Power*

[¶ 18] As we noted a few lines ago, the Wyoming Constitution expressly recognizes the legislative department's police power. In Article 2, § 1, of the Wyoming Constitution, the people have granted the legislative department its powers of government. In Article 10, § 2, of the Wyoming Constitution, the people have specifically granted the legislative department the police power of the state which "is supreme over all corporations as well as individuals." And, in Article 19, § 10, of the Wyoming Constitution, the people have granted the legislative department regulation of the manufacture, sale, and keeping for sale of intoxicating liquors. In the early days of statehood, this Court expressed unqualified recognition of the plenary legislative power when it said:

> The people of a State, in framing their constitution, committed to the legislature the whole lawmaking power of the State,

which they did not expressly or impliedly withhold. Plenary power in the legislature is the rule, for all purposes of civil government, and a prohibition to exercise a particular power is an exception.... [E]very subject within the scope of civil government is liable to be dealt with by the legislature.

*State ex rel. Bennett v. Barber,* 4 Wyo. 56, 61–62, 32 P. 14, 16 (1893) (citation omitted). In addition, this Court has said that the police power is

> most essential and very comprehensive. Under that power regulations are prescribed for the protection of the public health, public safety, and public morals, or, as more generally stated, the public welfare; and it is held to embrace regulations not only to promote the health, peace, morals, education, and good order of the people, but to extend to regulations designed to increase the industries of the State, develop its resources, and add to its wealth, or to promote the public convenience or general prosperity.

*State v. Sherman,* 18 Wyo. 169, 176, 105 P. 299, 300 (1909).

[¶ 19] No one disputes that regulation of all matters concerning intoxicating liquors is an area over which the legislative department is free to exercise its plenary police power. The judicial department has always recognized that "the power of the lawmaker to prohibit or regulate the sale of alcoholic beverages is practically unlimited." *Berry v. Arapahoe & Shoshone . Tribes,* 420 F.Supp. 934, 941 (D.Wyo.1976) (citations of Wyoming cases omitted). *And see generally, Pierce v. Albanese,* 144 Conn. 241, 129 A.2d 606, 611 (1957); *Ziffrin, Inc. v. Reeves,* 308 U.S. 132, 138–41, 60 S.Ct. 163, 167–68, 84 L.Ed. 128 (1939); 1 James F. Mosher, *Liquor Liability Law* § 2.05[1], at 2–50 (1987); and Daniel A. Klein, Annotation, *Supreme Court's views as to extent of states' regulatory powers concerning or affecting intoxicating liquors, under Federal Constitution's Twenty–First Amendment,* 134 L.Ed.2d 1015 (2000).

priate public policies deemed necessary to address those social problems. *Dellapenta,* 838

P.2d at 1166–69 (Thomas, J., dissenting; Cardine, J., dissenting but concurring in result).

[¶ 20] The product of the legislative department's comprehensive exercise of its plenary police power in matters concerning alcoholic beverages is largely found in Title 12 of the Wyoming statutes which contains nine chapters, numerous articles within each chapter, and numerous sections within each article. For other provisions in other titles addressing still other matters concerning intoxicating liquors, see Wyo. Stat. Ann., Cross References Ann., Title 12, at 215. It is within this comprehensive regulatory scheme that we find the evidence of the legislature's exercise of its plenary police power in the form of those specific sections creating the third-parties' tort claim against those liquor licensees and non-licensees who furnish intoxicating liquor to persons who become intoxicated and cause damage to those third parties.

[¶ 21] We now return to the Forty–Eighth State Legislature's product of 1985, § 12–8–301. In its enacted form, that 1985 law read as follows:

(a) No licensee is liable for damages caused by an intoxicated person to whom the licensee legally sold or furnished alcoholic liquor or malt beverages unless the licensee sold or provided alcoholic liquor or malt beverages to a person who was intoxicated, and:

(i) It was reasonably apparent to the licensee that the person buying or receiving the alcoholic liquor or malt beverage was intoxicated; or

(ii) The licensee knew or reasonably should have known from the circumstances that the person buying or receiving the alcoholic liquor or malt beverages was intoxicated.

(b) No person who is not a licensee who has gratuitously and legally provided alcoholic liquor or malt beverage to any other person is liable for damages caused by the intoxication of the other person.

(c) This section does not affect the liability of the intoxicated person for damages.

(d) This section does not affect the liability of the licensee or person if the alcoholic liquor or malt beverage was sold or provided in violation of title 12 of the Wyoming statutes.

(e) For purposes of this section "licensee" is defined in W.S. 12–1–101(a)(viii) and includes the licensee's employee or employees.

1985 Wyo. Sess. Laws ch. 205, § 1.

[¶ 22] Presumably, the legislature enacted this statutory tort claim with full knowledge of and with reference to *Parsons* and *McClellan.* *Almada,* 994 P.2d at 306 ("We presume the legislature enacts statutes with full knowledge of the existing condition of the law and with reference to it."). It is in that light that we closely examine this 1985 statute to identify the ways in which the legislature, in its first entry onto the field of liquor provider civil liability, changed the landscape established by this Court in those two earlier common law decisions. As we begin that examination, let us remember, too, that legislative authority repeals common law decisions. Wyo. Stat. Ann. § 8–1–101 (LexisNexis 2001); *and see, Snell v. Ruppert,* 541 P.2d 1042, 1046 (Wyo.1975), *overruled on other grounds, Ferguson Ranch, Inc. v. Murray,* 811 P.2d 287 (Wyo.1991).

[¶ 23] The 1985 version of § 301 consisted of five subsections, (a) through (e). Subsection (a) addressed the civil liability of a "licensee," as that term was defined in subsection (e). In regard to a licensee's civil liability for damages caused by an intoxicated person to whom the licensee *lawfully* provided liquors, the legislature declared that a licensee was not liable unless the intoxicated customer was intoxicated at the time the liquor was furnished *and* either (1) it was reasonably apparent to the licensee that the customer was intoxicated *or* (2) the licensee knew or reasonably should have known from the circumstances that the customer was intoxicated. 1985 Wyo. Sess. Laws ch. 205, § 1; Wyo. Stat. Ann. § 12–8–301 (Michie May 1985 Cum.Supp.) In addition, in subsection (d) the legislature declared that a licensee was liable if it furnished liquor in violation of Title 12 of the Wyoming statutes. *Id.* Importantly, in this law the legislature also addressed the question of a *non-licensee's* civil liability. Subsection (b) states that the non-licensee was not liable if he/she gratuitously and *legally* provided liquor to any person. *Id.*

[¶ 24] Comparing the narrow common law tort claim judicially created in *McClellan* with this 1985 legislatively created tort claim, one immediately sees that the legislature substantially changed the common law tort claim landscape. The narrow common law tort claim of liquor vendor liability for furnishing liquor to an intoxicated minor in his automobile at the vendor's drive-in area was expanded to a broad statutory tort claim of liquor vendor liability for furnishing liquor to any intoxicated person at any location, whether a drive-in area or inside the licensed premises. Also, the non-licensee liquor provider was addressed. One also notes that the legislature did not change the pre-existing common law rule of the intoxicated person's liability. § 12–8–301(c) (Michie May 1985 Cum.Supp.)

[¶ 25] As the above and foregoing examination makes clear, at the close of the Forty–Eighth State Legislature's General Session in 1985, the legislative and executive departments had enacted a full and comprehensive regulatory scheme expressing the state's social policy in the problematic area of liquor provider liability. That scheme covered, as the common law had not, all the actors: the licensed liquor provider, the non-licensed liquor provider (social host), the intoxicated person, and the injured third party.

[¶ 26] In less than a year after the close of that general session, however, the budget session of that same legislature saw legislative activity to amend § 12–8–301. Representatives Thomas Jones, Jack Sidi, Ellen Crowley, Dick Wallis, and Donald Jackson sponsored House Bill 0013, "[a]n act to amend W.S. § 12–8–301 relating to alcoholic beverages, denying liability for legally selling or furnishing alcoholic beverages." Dig. of House J., Forty–Eighth State Leg., Budget Sess., at 60–62 (1986). Introduced February 18, 1986, the bill moved quickly without incident through the legislative process of both chambers and was approved by the Governor on March 11, 1986. *Id.;* 1986 Wyo. Sess. Laws, ch. 6, §§ 1, 2. In its enacted form as § 12–8–301, it reads today as it did then:

(a) No person who has legally provided alcoholic liquor or malt beverage to any other person is liable for damages caused by the intoxication of the other person.

(b) This section does not affect the liability of the intoxicated person for damages.

(c) This section does not affect the liability of the licensee or person if the alcoholic liquor or malt beverage was sold or provided in violation of Title 12 of the Wyoming statutes.

(d) For purposes of this section "licensee" is as defined in W.S. 12–1–101(a)(viii) and includes the licensee's employee or employees.

Wyo. Stat. Ann. § 12–8–301 (LexisNexis 2001).

[¶ 27] Examining the section's four subsections, one readily sees significant legislative retrenchment of civil liability compared to the 1985 legislation. Importantly, in this regard a licensee which *legally* furnishes liquor to an intoxicated customer is not liable for damages caused by that customer's intoxication. § 12–8–301(a). However, the civil liability of a licensee or non-licensee person who sells or provides liquor in violation of Title 12 of the Wyoming statutes remains intact. § 12–8–301(c).

[¶ 28] Searching Title 12 of the Wyoming statutes for those provisions which if violated will expose the licensee or non-licensee person to civil liability for damages caused by an intoxicated person to whom liquor was sold or provided, one finds several that are pertinent. A non-licensee person, for example, a social host, is exposed to civil liability if he or she furnishes liquor to an underage person who is not the liquor provider's legal ward, medical patient, or immediate family member. Wyo. Stat. Ann. § 12–6–101(a) (LexisNexis 2001). Stated conversely, if the relationship of legal ward, medical patient, or immediate family member does exist between the liquor provider and the underage person, the liquor provider is deemed to have legally furnished liquor to the underage person and, therefore, is not liable to a third party damaged by the intoxicated underage person.

[¶ 29] On the other hand, a licensee is exposed to civil liability in several instances. If a licensee, after receiving written notice

from a court, parent, or guardian of an underage person or ward of the latter's minority, sells liquor to the underage person, then the licensee is exposed to liability. Wyo. Stat. Ann. § 12–5–502 (LexisNexis 2001). Similarly, if a licensee, after receiving written notice from the spouse or dependent of a habitual drunkard of the latter's neglect of support obligations, sells liquor to the habitual drunkard, then the licensee is exposed to liability. *Id.* Another instance of a licensee's liability exposure is found if a licensee sells liquor at the licensee's drive-in area to an underage person or to an intoxicated person. Wyo. Stat. Ann. § 12–5–301(a)(v) (LexisNexis 2001).

[¶ 30] We note that the legislature has not changed the intoxicated person's exposure to civil liability for damages he or she causes. § 12–8–301(b). Consequently, if a licensee or non-licensee person sells or provides liquor to another in violation of Title 12 and that consumer damages a third party, then both the liquor provider and the intoxicated person are exposed to civil liability. On the other hand, if the licensee or non-licensee person legally provides liquor to a consumer and that consumer damages a third party, then only the intoxicated consumer is exposed to civil liability.

[¶ 31] As the legislature has broadly drawn the statutory tort claim, it covers the myriad ways by which an intoxicated person can cause damage. An intoxicated person can cause damage to himself or herself or a third party negligently or intentionally, when using a mobile vehicle (automobile, airplane, railroad engine, etc.), or when not using a mobile vehicle. *See* Mosher, *supra*, § 1.02[2]—[4], at 1–5 through 1–9.

[¶ 32] Our foregoing review of the statutorily created and amended tort claim as it existed in 1986 and at the time of the Sampsell–Greenwalt automobile accident in question reveals that, although retrenchment of liability occurred in some ways, the legislative product remained a full and comprehensive regulatory scheme expressing the State's social policy in this most complex area of damages caused by intoxicated members of our society.

*Open Courts Provision*

[¶ 33] With that background in mind, we consider Greenwalts' contention that § 12–8–301 prevents or impedes access to the courts because it grants immunity from tort actions to alleged tortfeasor vendors whose sale and service of liquor to patrons result in injuries to another and, by impinging on this fundamental right, strict scrutiny must be applied when considering any classification. Article 1, § 8 of the Wyoming Constitution provides:

All courts shall be open and every person for an injury done to person, reputation, or property shall have justice administered without sale, denial or delay. Suits may be brought against the state in such manner and in such courts as the legislature may by law direct.

The right to access to the courts is a fundamental right. *Robinson v. Pacificorp*, 10 P.3d 1133, 1136 (Wyo.2000) (citing *Mills v. Reynolds*, 837 P.2d 48, 54 (Wyo.1992)). The provision is not a limitation on lawmakers who, in the proper exercise of the legislative power, may alter or abolish common law causes of action as long as that legislative action does not violate some other provision of our constitution. *Mull v. Wienbarg*, 66 Wyo. 410, 419–20, 212 P.2d 380, 382–83 (1949). The open courts provision was included in our constitution to insure equal administration of justice by the judiciary and did not intend application to the legislature nor to create a fundamental right to full legal redress. No one has a vested right to any rule of common law. *Id.*

[¶ 34] The Wyoming legislature has the power to abolish substantive common law rights, including those traced to the common law of England, in order to attain a permissible legislative object. *Schlattman v. Stone*, 511 P.2d 959, 960–62 (Wyo.1973). The common law of England was not adopted in the State of Wyoming by our constitution and prevails here only by virtue of its adoption into the law of the state by legislative enactment. *Id.* This provision means "no more nor less than that ... the courts must be accessible to all persons alike ... and afford a speedy remedy for every wrong recognized by law as being remedial in

court." *Mull,* 66 Wyo. at 423, 212 P.2d at 384 (quoting *Shea v. North Butte Mining Co.,* 55 Mont. 522, 179 P. 499, 502 (Mt.1919)). It does not strip the legislature of all power to alter or repeal any portion of the common law relating to accidental injuries or the death of one person by the negligence of another. *Id.*

[¶ 35] The legislature, however, cannot destroy vested rights. *Id.* Where an injury has already occurred for which the injured person has a right of action, the legislature cannot deny a remedy; but the remedies recognized by the common law in this class of cases, together with all rights of action that may arise in the future may be altered or abolished to the extent of destroying actions for injuries or death arising from negligent accident, so long as there is no impairment of rights already accrued. *Id.* at 382–84.

[¶ 36] Thus, the courts are to afford remedies not for every wrong but for every wrong recognized by law. In order to establish an "open courts" violation, a litigant must satisfy a two-part test: first, he must show that he has a well-recognized common-law cause of action that is being restricted; and second, he must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Robinson,* 10 P.3d at 1137.

[¶ 37] The Greenwalts' contentions cannot survive this first prong of the test. Our historical review just set forth established that the common law did not recognize a cause of action against a liquor vendor for injuries to a third person by a consumer of alcohol. Although *McClellan* altered the common law, our previous discussion reveals that its holding was narrow and limited to its particular facts, the illegal sale of liquor to a minor at a drive-in area. Here, the liquor vendor's sales and service was legal, and *McClellan* would not apply to these particular facts. We find no violation of the open courts provision.

*Equal Protection*

[¶ 38] With all that has gone before fresh in our mind, we are now ready to turn our attention to the equal protection constitutional question at hand. In creating the statutory tort claim in question, the Wyoming legislature has designed a law that is at once both encompassing and symmetrically simple. It is encompassing in the sense that it covers all liquor providers, licensees as well as non-licensees (social hosts), and liquor consumers, *i.e.,* intoxicated persons; it is simple in the sense that liquor providers are exposed to civil liability if they *unlawfully* furnish liquor to another who then causes damage to a third party, and in the sense that the intoxicated person, whether lawfully or unlawfully provided liquor, remains exposed to civil liability for damage he causes a third party. At the heart of this statutory tort claim, the legislature has drawn a distinction between liquor providers (licensees and non-licensees) who *legally* furnish liquor to consumers, on the one hand, and, on the other hand, liquor providers (licensees and non-licensees) who *unlawfully* furnish liquor to consumers. As a natural consequence of this explicit legislatively-drawn distinction, an implicit legislatively-drawn distinction appears: a distinction between third parties damaged by the intoxicated consumer *legally* served, on the one hand, and, on the other hand, third parties damaged by the intoxicated consumer *unlawfully* served. The former class of damaged third parties has tort claims against the intoxicated consumer, but not against the liquor provider who *legally* served that consumer; the latter class of damaged third parties have tort claims against the intoxicated consumer and the liquor provider who *unlawfully* served that consumer. The question before us is whether a rational basis exists justifying these legislatively-drawn distinctions for purposes of the equal protection provisions of the United States and Wyoming Constitutions.

[¶ 39] At this juncture, some preliminary observations of the applicable constitutional law are in order. The Greenwalts are challenging the legislature's liquor-provider tort claim law under the equal protection provisions of both the federal and Wyoming Constitutions. The federal equal protection clause provides: "No state shall . . . deny to any person within its jurisdiction

the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Wyoming Constitution does not contain such an express "equal protection" clause; rather, it contains a variety of equality provisions, *viz.,* Article 1, §§ 2, 3, and 34; and Article 3, § 27. Like the Wyoming Constitution, "[m]ost state constitutions do not contain an 'equal protection' clause ... [b]ut ... do contain a variety of equality provisions." Robert F. Williams, *Equality Guarantees in State Constitutional Law,* 63 Tex. L.Rev. 1195, 1196 (1985). Despite the difference in text between the federal equal protection clause and the equality provisions in most state constitutions, "[m]ost state courts use conventional federal equal protection analysis when interpreting the various equality provisions of their state constitutions." *Id.* at 1222. Comparing the bedrock principles of rational-basis review in federal equal protection analysis, including the presumption of the constitutionality of a statute and the burden of a party challenging a statute, with those used in this Court's equal protection analysis from the early days of statehood to the present, one does not find any significant difference. The bedrock principles are these: [2]

1. The federal equal protection clause and the Wyoming equality provisions "have the same aim in view." *Washakie Cty. Sch. Dist. No. 1 v. Herschler,* 606 P.2d 310, 332 (Wyo.1980); *Nehring v. Russell,* 582 P.2d 67, 76 (Wyo.1978); *Pirie v. Kamps,* 68 Wyo. 83, 94, 229 P.2d 927, 930–31 (1951); *In Re Gillette Daily Journal,* 44 Wyo. 226, 239, 11 P.2d 265, 269 (1932); 68 Wyo. 83, 229 P.2d 927, 26 A.L.R.2d 647.

2. A classification in a statute, such as § 301 (the liquor provider civil liability statute), comes to the reviewing court bearing a strong presumption of validity. *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 314, 113 S.Ct. 2096, 2101–02, 124 L.Ed. 211 (1993); *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993); *Clajon Prod. Corp. v. Petera,* 70 F.3d 1566, 1580 (10th Cir.1995); *Paint-*

*er v. Abels,* 998 P.2d 931, 939 (Wyo.2000); *Hoem v. State,* 756 P.2d 780, 782 (Wyo. 1988); *State v. Langley,* 53 Wyo. 332, 345, 84 P.2d 767, 771 (1938).

3. A party attacking the rationality of the legislative classification has the heavy burden of demonstrating the unconstitutionality of a statute beyond a reasonable doubt. *F.C.C. v. Beach Communications, Inc.,* 508 U.S. at 315, 113 S.Ct. at 2102; *Small v. State,* 689 P.2d 420, 426 (Wyo.1984) *Nehring,* 582 P.2d at 74.

4. Equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices and line-drawing. In areas of social policy, a statutory classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. *F.C.C. v. Beach Communications, Inc.,* 508 U.S. at 315, 113 S.Ct. at 2102; *Clajon Prod. Corp.,* 70 F.3d at 1580; *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351, 1355 (Wyo.1978); *Sherman,* 18 Wyo. at 177, 105 P. at 300; *McGarvey v. Swan,* 17 Wyo. 120, 139, 96 P. 697, 702 (1908).

5. The reviewing court never requires a legislature to articulate its reasons for enacting a statute; therefore, it is entirely irrelevant for equal protection purposes whether the conceived reason for the challenged distinction actually motivated the legislature. The absence of "legislative facts" explaining the distinction on the record has no significance in rational-basis review. In other words, a legislative choice is not subject to courtroom fact-finding and need not be based upon evidence or empirical data. *F.C.C. v. Beach Communications, Inc.,* 508 U.S. at 315, 113 S.Ct. at 2102; *Clajon Prod. Corp.,* 70 F.3d at 1580.

To ascribe a purpose or purposes to the statutory classification, "the court may properly consider not only the language of

---

2. *See generally* Joseph Tussman and Jacobus ten-Broek, *The Equal Protection of the Laws,* 37 Cal. L.Rev. 341–81 (1949) (a "comprehensive analysis of the principles of equal protection as a discrete

technique of judicial decision," according to *Developments in the Law–Equal Protection,* 82 Harv. L.Rev. 1065, 1067 (1969)).

the statute but also general public knowledge about the evil sought to be remedied, prior law, accompanying legislation, enacted statements of purpose, formal public announcements, and internal legislative history. If an objective can confidently be inferred from the provisions of the statute itself, recourse to internal legislative history and other ancillary materials is unnecessary." *Developments in the Law— Equal Protection*, 82 Harv. L.Rev. at 1077. "The court is expected to safeguard constitutional values while at the same time maintaining proper respect for the legislature as a coordinate branch of government." *Id.* at 1078.

6. These restraints on judicial review have added force where the legislature must necessarily engage in a process of line-drawing. Defining the class of persons subject to a regulatory requirement inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration. Such scope-of-coverage provisions are unavoidable components of most social legislation. The necessity of drawing lines renders the precise coordinates of the resulting legislative judgment virtually unreviewable because the legislature must be allowed leeway to approach a perceived mischief incrementally. *F.C.C. v. Beach Communications, Inc.*, 508 U.S. at 315–16, 113 S.Ct. at 2102; *see also Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *Clajon Prod. Corp.*, 70 F.3d at 1581; *Garton v. State*, 910 P.2d 1348, 1355 (Wyo.1996); *White v. State*, 784 P.2d 1313, 1315–16 (Wyo.1989); *Troyer v. State*, 722 P.2d 158, 165 (Wyo.1986); *Galesburg Const. Co. v. Bd. of Trustees of Mem. Hosp. of Converse Cty.*, 641 P.2d 745, 750 (Wyo.1982) (citing *Denny v. Stevens*, 52 Wyo. 253, 75 P.2d 378 (1938)); *Kenosha Auto Transport Corp. v. City of Cheyenne*, 55 Wyo. 298, 312–13, 100 P.2d 109, 114 (1940); *Trent v. Union Pacific*, 68 Wyo. 146, 162–63, 231 P.2d 180, 185 (1951), *overruled on other grounds, Bowers v. Wyo. State Treasurer*, 593 P.2d

182 (Wyo.1979); *In Re Gillette Daily Journal*, 44 Wyo. at 242, 11 P.2d at 269–70.

7. The rational-basis test is "not a toothless one." It allows the court to probe to determine if the constitutional requirement of some rationality in the nature of the class singled out has been met. *Schweiker v. Wilson*, 450 U.S. 221, 234, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1981); *James v. Strange*, 407 U.S. 128, 140, 92 S.Ct. 2027, 2034, 32 L.Ed.2d 600 (1972); *Johnson v. State Hearing Examiner's Office*, 838 P.2d 158, 172 (Wyo.1992); *Ludwig v. Harston*, 65 Wyo. 134, 169, 197 P.2d 252, 267 (1948).

8. Equal protection permits a state a wide scope of discretion in enacting laws which affect some groups of citizens differently than others; it does not prevent a reasonable classification of the objects of legislation. The question in each case is whether the classification is reasonable in view of the object sought to be accomplished by the legislature. All reasonable doubts are to be resolved in favor of the validity of the statute. The legislature is presumed to have acted upon a knowledge of the facts and to have had in view the promotion of the general welfare of the people as a whole. The legislature having presumably determined that a difference of conditions exists rendering the legislation proper, the court must be able to say, upon a critical examination of the statute in the light of the object sought to be accomplished, or the evil to be suppressed, that the legislature could not reasonably have concluded that distinctions existed relating to the purpose and policy of the legislation. *Sherman*, 18 Wyo. at 177, 105 P. at 300; *see also F.C.C. v. Beach Communications, Inc.*, 508 U.S. at 313–16, 113 S.Ct. at 2101–02; *McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961); *WW Enterprises, Inc. v. City of Cheyenne*, 956 P.2d 353, 356 (Wyo.1998); *Nehring*, 582 P.2d at 78.

[¶ 40] Let us now apply these bedrock principles to the question at hand. These principles are, of course, the foundation of this Court's multi-part test as de-

scribed in several past decisions. Succinctly stated, the elements of the test [3] are:

1. Identify the legislative classification at issue;

2. Identify the legislative objectives;

3. Determine whether the legislative classification is rationally related to the achievement of an appropriate legislative purpose. In this element the court is evaluating whether the legislature's objectives justify the statutory classification.

See generally, Allhusen v. State Mental Health Prof. Lic. Bd., 898 P.2d 878, 885–86 (Wyo.1995); Johnson, 838 P.2d at 166–67; and Doering v. WEA Ins. Group, 193 Wis.2d 118, 532 N.W.2d 432, 439 (1995).

[¶ 41] Because the Greenwalts have the burden of demonstrating that § 301 violates the equal protection guarantees beyond a reasonable doubt, as we work our way through each test element enumerated above, we shall lead with the challengers' (Greenwalts) position, follow with the defenders' (Ram Restaurant, et al.) position, and conclude with our own analysis.

*Identification of the Legislative Classification within § 301*

[¶ 42] The Greenwalts assert that § 301 "clearly sets apart victims of alcohol vendor negligence for treatment different from that enjoyed by the victims of any other tortfeasor's negligence." They maintain that every other victim of a tort is guaranteed the right to pursue compensation for the damages caused by the negligent acts of others, but under § 301 they are precluded from pursuing compensation from a negligent Wyoming alcohol vendor. Given these assertions, one can only conclude that the Greenwalts are identifying the classification at issue as all tort victims versus alcohol vendor tort victims. The Greenwalts also make the unsupported assertion that "[t]hese innocent tort victims are also a group which has been subject to a tradition of disfavor.... [V]ictims of alcohol vendor negligence are a class of politically powerless persons, unable to compete with the high-dollar lobbying efforts

of insurance companies and the liquor industry...."

[¶ 43] Countering the Greenwalts' assertions, the sense of the defenders' reply is that the Greenwalts have failed to identify within the text of § 301 the classification at issue. In this regard, the defenders maintain that the Greenwalts have failed to "show that they are members of an identifiable class that has been harmed by the statute and that other members of this class who are similarly situated ... are treated differently." The defenders argue that the Greenwalts' position that § 301 "impacts one tort plaintiff different than other tort plaintiffs ... render[s] the first [element] of the ... test meaningless" because it fails to identify *within the text of the challenged statute* the class allegedly harmed by the statute. The defenders explain that § 301 creates a cause of action, a tort claim if you will, that treats everyone equally. In § 301, they observe, "the legislature has simply defined the appropriate standard of care or duty as compliance with the provisions of Title 12." Further explaining, they state:

All persons who are injured by an intoxicated person may have a cause of action against a person who *illegally furnished* alcohol in derogation of the statutorily defined duty. A person does not violate any recognized duty and is, therefore, not negligent, where he *legally serves* alcohol to another person. Similarly, all persons injured by an intoxicated ... party who was *legally served* alcohol do not have a right of recovery against the supplier of alcohol.

(emphasis added). The defenders also point out that all tort law necessarily involves a decision, either by a common law court in the case of a judicially-created tort claim or by a legislature in the case of a legislatively-created tort claim, to recognize or reject a right of recovery for any alleged wrong. In the defenders' words, "[w]ithout a duty, there is no actionable negligence and thus no right of recover." Continuing with this line of reasoning, the defenders state that because a

---

**3.** In their classic work, Professors Tussman and tenBroek reversed the order of the first two elements. Tussman, *supra,* at 366–68.

third person injured by an intoxicated person had no legally cognizable tort claim against the liquor provider under the old common law rule, "it is difficult to imagine how the legislature's expansion of [such] person's right to recover can be said to harm any class of persons. Rather, the legislature simply has not 'granted as extensive a right as it might have ....'" (citing *Robinson v. Pacificorp*, 10 P.3d 1133, 1138 (Wyo.2000)). Concluding on the point, the defenders dismiss the Greenwalts' identification of the classification as being "all tort plaintiffs" versus "alcohol vendor plaintiff." The defenders recognize that every statutorily-created tort claim may well treat the potential plaintiff or defendant in that particular regulated business differently from plaintiffs and defendants in unrelated businesses or areas of human activity in which tort claims may be either statutorily created or perhaps judicially created. Equal protection simply does not apply to that species of disparate treatment. The creation of a tort claim in any particular area of human activity, whether judicially created or legislatively created, is a function "of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Mostert v. CBL & Assoc.*, 741 P.2d 1090, 1093 (Wyo. 1987).

[¶ 44] Finally, the defenders summarily reject the Greenwalts' assertion that "innocent tort victims" are a group which has been subjected to a tradition of disfavor. The defenders observe that the assertion enjoys no legal support and, moreover, ignores that "the people are the most powerful lobby in government [because they] can vote to elect their representatives" who enact legislation such as § 301. The defenders also note that "Mothers Against Drunk Driving" (MADD) is a powerful national lobbying organization. Concluding on this point, the defenders point out that because this Court in *Ellett v. State*, 883 P.2d 940, 945 (Wyo.1994), similarly rejected "politically powerless" status for "physically injured youthful offenders," this Court should recognize in this case that the much broader class of "potential tort plaintiffs" has more political clout than "physically injured youthful offenders."

[¶ 45] We reject the Greenwalts' identification of the legislative classification at issue. We agree with much of that said by the defenders of § 301. The Greenwalts have misapplied this first element of the test because they have failed to look within the text of § 301 to identify the classification at issue. *See, e.g., F.C.C. v. Beach Communications, Inc.*, 508 U.S. at 309–310, 314, 113 S.Ct. at 2099, 2101–02 (identifying classifications within the text of the pertinent provisions of the Cable Communications Act of 1984); *Nehring*, 582 P.2d at 70 n. 1, 77 (identifying the classification within the text of Wyoming's Guest Statute, § 31–5–1116, to be paying passengers in automobiles and non-paying passengers in automobiles); *Doering*, 532 N.W.2d at 439–40 (identifying classifications within the text of an alcohol providers civil liability/immunity statute similar to Wyoming's § 301); *Cory v. Shierloh*, 29 Cal.3d 430, 174 Cal.Rptr. 500, 629 P.2d 8, 11–14 (1981) (identifying classifications within the text of an alcohol providers civil liability/immunity statute similar to Wyoming's § 301); *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 987 P.2d 300, 306–09 (Id. 1999) (identifying classifications within the text of an alcohol providers civil liability/immunity statute similar to Wyoming's § 301); *Tussman, supra*, 37 Cal. L.Rev. at 344 ("A legislature defines a class, or 'classifies,' when it enacts a law applying to 'all aliens ineligible for citizenship,' or 'all persons convicted of three felonies,' or 'all citizens between the ages of 19 and 25'....").

[¶ 46] Looking within the text of § 301, we readily discover that the legislature has expressly drawn a distinction between liquor providers (both licensees and non-licensees) who *lawfully* furnish liquor to consumers, on the one hand, and liquor providers (both licensees and non-licensees) who *unlawfully* furnish liquor to consumers, on the other hand. As a natural result of this explicitly drawn distinction, an implicitly drawn distinction appears: a distinction between third parties damaged by the *lawfully* served intoxicated customer, on the one hand, and third parties damaged by the *unlawfully* served intoxicated customer, on the other. The liquor provider who *lawfully* furnishes liquor is immune from civil liability and the

third party damaged by the *lawfully* served intoxicated customer has no tort claim against that liquor provider. On the other hand, the liquor provider who *unlawfully* furnishes liquor is not immune from civil liability and the third party damaged by the *unlawfully* served intoxicated customer has a viable tort claim against that liquor provider. And, in all cases, the third party damaged by the intoxicated customer has a viable tort claim against that intoxicated customer.

*Identification of the Legislative Objectives*

[¶ 47] The Greenwalts assert that § 301 "is silent as to its intended purpose." They maintain, however, that "the history of the statute, as well as the comments of its drafter [Representative Tom Jones], sheds significant light on its intended function." They infer that the legislature's "very clear" intent was the "liability insurance issue;" thus, they infer that "total immunity was granted to Wyoming's liquor vendors in an effort to protect their financial interests and liability insurers from the potentially large verdicts for which they could be held responsible," referencing this Court's *McClellan* decision. In their effort "to negative every [reasonably] conceivable basis which might support [the legislative classification]," *F.C.C. v. Beach Communications, Inc.*, 508 U.S. at 315, 113 S.Ct. at 2102; *see also, Hoem*, 756 P.2d at 782-83; *Mountain Fuel Supply Co.*, 578 P.2d at 1355, the Greenwalts hypothesize, and then reject, the objective of allocation of all the consequences of intoxication to the intoxicated customer. Finally, they dismiss as a possible objective the legislating of proximate cause issues because Wyoming's comparative fault statute, Wyo. Stat. Ann. § 1-1-109, "already accomplishes this function" and the legislature has no "interest in duplicating this task."

[¶ 48] Countering the Greenwalts' assertions, the defenders of § 301 propose that the obvious primary legislative objective is "to define a cause of action historically unknown at the common law that harmonizes ... with the compelling State interest in regulating the sale, gift, and consumption of alcohol." Moreover, they contend that

[t]he statute accomplishes this purpose by defining the extensive rules and regulations of Title 12 as the appropriate standard of care for those who furnish alcohol to others. Thus, the State encourages compliance with the mandates of Title 12 by attaching the potential for civil liability for those who violate the law.

[¶ 49] Having carefully considered the parties' contentions, we must disagree with the Greenwalts' identification of the legislative objective and agree with the defenders' identification. As Professors Tussman and tenBroek remind us with simplicity, "[t]he purpose of a law may be either the elimination of a public 'mischief' or the achievement of some positive good." Tussman, *supra*, 37 Cal. L.Rev. at 346. To discover the legislative objective, one commentator counsels:

[T]he court may properly consider not only the language of the statute but also general public knowledge about the evil to be remedied, prior law, accompanying legislation, enacted statements of purpose, formal public pronouncements, and internal legislative history. If an objective can confidently be inferred from the provisions of the statute itself, recourse to internal legislative history and other ancillary materials is unnecessary.

*Developments in the Law—Equal Protection*, 82 Harv. L.Rev. at 1077.

[¶ 50] Another commentator writing of "the act of discovering ... purpose," advises "[g]enerally it is unmistakable." Max Radin, *A Short Way With Statutes*, 56 Harv. L.Rev. 388, 398 (1942). At the risk of restating the obvious, Professor Radin observes:

The statute is expressed in definite written words. They have been selected not for their symbolic or esoteric value, nor even for their logical or aesthetic quality, but primarily to let us know the statutory purpose.

*Id.* at 400. He further helpfully explains:

A statute is better described as an instruction to administrators and courts to accomplish a definite result, usually the securing or maintaining of recognized social, political, or economic values. If figures of speech will help, we may call the statute a ground design, or a plan in which

the character and size of a structure are indicated, and in which details are given only so far as they are necessary to assure the erection of the desired structure. We may follow the figure further ... and say that details of construction may sometimes be provided in order that losses may not be suffered in other social structures of equal or even greater value.

*Id.* at 407. Finally, Professor Radin observes:

The purpose of the statute is not quite the same as its policy. The policy may be part of a general governmental theory. The purpose is the specific result than can reasonably be taken to be what the statute is striving to attain.

\* \* \* \*

The determination both of the purpose and means must be affected by reading the words of the statute. To be sure ... it should be from a reading of the whole statute and not from an examination of detached words.... All things which are before us are expressed in words and not otherwise.

*Id.* at 408–09.

[¶ 51] Having read the definite written words of § 301 and the other pertinent provisions of Title 12, having considered the general public knowledge about the evils attending the sale and furnishing of intoxicating liquors to our state's citizens, and having considered the prior common law decisions and statutory law, we can confidently conclude that the legislative objective of § 301 is unmistakably what the defenders of that law have identified: a comprehensive statutory tort claim affecting liquor providers (both licensee and non-licensees), intoxicated customers/guests of all liquor providers, and third parties who are damaged by intoxicated customers/guests. Unquestionably, § 301 has at least three basic secondary purposes, as is common with respect to tort claims generally, namely:

(1) penal or deterrence (intended to punish liquor providers for the wrongful provision thereof);

(2) compensatory (intended to provide compensation for injured third-party victims); and

(3) regulatory (intended to impose some of the costs of alcohol-related injuries on the industry and citizenry and to ensure adequate financial responsibility/insurance from industry and citizen participants).

*Red Flame, Inc. v. Martinez,* 2000 UT 22, ¶ 16, 996 P.2d 540, ¶ 16 (Utah 2000) (Durham, Assoc. C.J., dissenting), and authorities cited therein. We believe that "[t]hese purposes reflect significant public policy choices about financial liability for a widespread source of private and public harm—the damage done by intoxicated persons to third parties." *Red Flame, Inc.* ¶ 16.

[¶ 52] We reject the Greenwalts' proffer of evidence, in the form of sponsor Representative Tom Jones' letter to the Legislative Service Office, as evidence of the legislature's intent in enacting § 301. *Independent Producers Marketing Corp. v. Cobb,* 721 P.2d 1106, 1108 (Wyo.1986); *see also, Rasmussen v. Baker,* 7 Wyo. 117, 147–48, 50 P. 819, 827–28 (1897), (cautioning against the reliability of the various remarks of members of the Wyoming Constitutional Convention upon the subject of the construction of any particular provision of the state constitution).

[¶ 53] We also reject Greenwalts' brief argument that the legislature would not have had the objective of legislating proximate cause issues because the comparative fault statute, § 1-1-109, "already accomplishes this function." While it is true that the legislature in that particular law generally espoused the comparative negligence approach for negligence actions, "this is not to say that the legislature is precluded from subsequently limiting, or even rejecting altogether, the application of comparative negligence in negligence actions arising out of particular circumstances." *Coghlan,* 987 P.2d at 309; *and see, Red Flame, Inc.,* ¶ 20 (Durham, J., dissenting).

[¶ 54] We have now identified both the legislative classification at issue and the legislative objectives. Having worked our way through these first two test elements of rational-basis review, we next proceed to the third, and final, element, whether the legisla-

tive classification is rationally related to the achievement of an appropriate legislative purpose.

*Whether the Legislative Classification is Rationally Related to the Achievement of an Appropriate Legislative Purpose*

[¶ 55] As we have noted in our above and foregoing treatment of the first two elements of the rational-basis test, the Greenwalts identified the relevant legislative classification at issue as "victims of alcohol vendor negligence" and identified the legislative objective as the protection of the financial interests of Wyoming's liquor vendors and their insurers against potentially large verdicts in cases arising out of tragic motor vehicle accidents like the ones described in *Parsons* and *McClellan.* Because the Greenwalts have incorrectly identified both the legislative classification at issue and the legislative objectives, they do not enjoy a position of strength from which to launch a successful attack on this third, and final, element of the rational-basis review test. Proceeding from these incorrect premises, the Greenwalts assert here that the classification of "victims of alcohol vendor negligence" is not rationally related to the achievement of an appropriate legislative purpose in that the protection of the financial interests of Wyoming liquor vendors and their insurers is most certainly not an appropriate legislative purpose. They contend, as noted earlier, that § 301 is irrational because it "attempts to legislate proximate cause" and because "it actually serves to damage the State's important interest in promoting public health and safety." In § 301, they maintain, the legislature "has taken away the positive deterrent affect [sic] that civil liability has on every other individual and commercial citizen in Wyoming ... despite the fact that vendors of alcohol are distributing a particularly dangerous product." They ask this Court to consider the "unique position alcohol vendors enjoy." In this regard, they say that "[c]ommercial vendors sell and distribute the majority of the intoxicating beverages which contribute to the intoxication and resulting injury of Wyoming citizens." They claim that alcohol vendors are "often the sole source of recovery for injuries which are caused by the vendor's improper sale of alcohol ... [and] are in a unique situation to insure against potential loss suffered ... and to spread the costs of insurance by increasing drink prices." Finally, they contend that

> vendors of alcohol, particularly restaurant and bar owners, are in an exceptional position to protect the public by preventing their patrons from imbibing excessive amounts of alcohol and, thereafter, being turned out into the night to endanger the public. With the experience and training that many vendor's [sic] employees have in recognizing intoxication, combined with the vendor's own internal guidelines and standards for detecting and dealing with obviously intoxicated patrons, such as existed in the Defendant's organization, vendors are in a better position than law enforcement, the general public or the victims of intoxication to prevent the tragedies which arise from the consumption of alcohol.

The Greenwalts conclude that § 301 actually defeats the legitimate legislative objectives of protecting the public, spreading the costs of liability, and curbing the profit motives of alcohol vendors.[4]

[¶ 56] As we noted earlier in this opinion, the defenders disagreed with the Greenwalts' analyses of the first two elements of the rational-basis test and set forth their own analyses with which, as previously explained, we were in agreement. It is not surprising, then, on this final element of the rational-basis test, that we find the defenders of § 301 in disagreement once more with the Greenwalts. The defenders correctly identified both the legislative classifications at issue and the legislative objectives. Proceeding from these correct premises, the defenders here maintain that the classifications of *lawful* and *unlawful* liquor providers and third parties injured by *lawfully* and *unlawfully* served intoxicated persons are rational-

---

4. The Greenwalts reason that the more alcohol that vendors sell to a customer, the more profitable the business; but, the more alcohol sold to a customer, the more likely it will be that a cus-

tomer will become intoxicated "to a level where he/she presents a danger to the general public; particularly at a bar where that customer is likely to need to drive home."

ly related to the achievement of the primary legitimate legislative objective of creating all the necessary elements of a statutory tort claim historically unknown in Wyoming's common law that harmonizes with the State's legitimate interest in regulating the sale, gift, and consumption of alcohol. They also maintain that these classifications are rationally related to the achievement of the several secondary legislative objectives that attend the creation of any tort claim, namely, deterrence, compensation, and regulating or cost-spreading. It is elementary that the traditional elements of a negligence tort claim are duty, breach of duty, proximate cause, and damages. The legislative classifications clearly revolve around these elements and the traditional policy considerations that drive them. As the defenders point out, the legislature has defined the duty/breach of duty elements in terms of the liquor providers' violations of the regulatory provisions of Title 12. As they contend, that mode of definition is, and always has been, perfectly acceptable in tort law. Indeed, in *McClellan*, this Court itself did just that, that is, it established the legal duty of the alcohol vendor as a function of compliance with two particular statutory provisions, one dealing with unlawfully providing alcohol to underage persons, the other dealing with unlawfully providing alcohol to an intoxicated person in a motor vehicle at the alcohol vendor's drive-in area. With respect to the tort claim element of "proximate cause," the legislature has, as the defenders note, and as the Greenwalts protest, legislated the rationale of the old common law rule recognized by this Court in *Parsons:* as long as the liquor provider *lawfully* provided the liquor, the proximate cause of the injury was deemed to be the consumption of liquor and not its sale. The defenders advise us that other courts have recognized that it is not irrational for a legislature to adopt the public policy pronouncements expressed in the decisions of a common law court. *See, e.g.,* *Doering,* 532 N.W.2d at 442. Because the legislature has tied the elements of duty/breach of duty and proximate cause with the extensive mandates of Title 12, the defenders reason, that tie well serves the legitimate interest of promoting compliance with those mandates.

[¶ 57] The defenders also note that the classification "promotes one of the most fundamental public policies in Wyoming, that of personal responsibility." As the defenders state it, "[t]his is especially true when a person legally provides alcohol to a responsible adult." The responsible adult is charged with the duty to act responsibly when drinking and, the defenders observe, even when intoxicated. Section 301 specifically preserves the third party's tort claim against that intoxicated person. In the defenders' view, to the extent that another legislative configuration would impose liability upon the lawful liquor provider, that configuration may tend to discourage the drinker's responsibility to act reasonably under the circumstances.

[¶ 58] Answering the Greenwalts' argument that the legislature would have been better advised to place on the alcohol provider (vendor, bartender, wait staff, liquor store clerks, and social hosts of every kind) the duty to monitor the drinking citizen's consumption, the defenders respond that, yes, the legislature could have drawn the line differently than it did, but sound reasons exist why it chose not to. The defenders explain at length that placing the monitoring duty upon the alcohol provider

> would then raise the question of whether it is proper and fair to require [an alcohol provider] to substitute his or her judgment for that of a responsible adult when it comes to the consumption of alcohol. Who should have the responsibility to monitor a person's alcoholic intake and subsequent actions—a mature adult [drinker] or a waiter?
>
> * * * *
>
> If the legislature did decide to impose such a duty on suppliers of alcohol, what are its practical limits? Is the duty limited to those [drinkers] who the [supplier] knows will be driving? Must [the supplier] ask every patron to check [his or her] car keys at the door? If so, when may [the supplier] return the keys? Must [a supplier] administer a breathalyzer test before returning keys? What if the person swears [he or she isn't] driving? Is this promise

sufficient or must [the supplier] actually follow the person out to the car to make certain [he or she doesn't] get behind the wheel? Must [the supplier] ascertain whether the person consumed alcohol before arrival? Should servers of alcohol institute a "drink count" and, if so, what is the limit? Should the legislature attempt to enact such stringent rules? How would these rules apply to vendors who face a wide variety of circumstances? For example, how exactly would Cheyenne Frontier Days or the Casper Events Center monitor the intake of those buying beer? And where does all of this leave the social host, or the non-profit organization that may serve alcohol at a function?

The defenders argue that "[t]he difficulty in enforcement is obvious."

[¶ 59] They also observe that the legislature may have desired to "enact only those laws that clearly define the conduct required of its citizens." They posit that the legislature may have reasonably believed that "[w]ithout defined limits, [alcohol providers] potentially face liability or at least the costly threat of litigation every time they serve a beer." They say that the legislature may have reasonably believed that that threat would "pose a hardship on the small businessmen and [business women] who own and operate the vast majority of the restaurants, bars, and package liquor stores in our state." The defenders further observe that "[t]he legislature could also have been concerned that the creation of a new and expansive cause of action would create additional burdens on a court system," which would then implicate "the legislature's role in funding the judicial system."

[¶ 60] Summing up, the defenders remind this Court that it falls to the legislative department to draw the lines in approaching the solution to a difficult and complex social problem, which intoxication certainly is. In this instance, they urge, the legislature has made the tough choices and has rationally drawn those lines by declaring that the intoxicated adult, not the alcohol provider who *lawfully* serves alcohol, is legally responsible for his or her own actions. They maintain that § 301 serves numerous legitimate state interests and applies equally to both alcohol vendors and social hosts.

[¶ 61] We have carefully considered the parties' thrusts and parries, and gratefully acknowledge their excellent and thought-provoking arguments. We must now decide. We disagree with the Greenwalts' analysis and are compelled to side with the defenders' stronger and more persuasive presentation. To avoid extending unnecessarily the length of this opinion, we shall enumerate only briefly those telling points which are primary with us.

[¶ 62] The legislature in 1985 enacted and then in 1986 amended § 301 with full knowledge of and with reference to *Parsons* and *McClellan*. Accordingly, the legislature could reasonably have concluded that the full nature and scope of the liability and immunity of all alcohol providers, licensed vendors and non-licensed persons alike, was uncertain. The legislature could reasonably have concluded that *McClellan's* judicially-created tort claim was narrowly drawn given the operative facts of that case. Given the Court's invitation in *Parsons* and the Court's impatience in *McClellan*, the legislature could reasonably have concluded that the time had come to address the social problem revealed in those cases. The legislature could have rationally thought that it must create a comprehensive, yet simple-to-administer tort claim to cover all liquor providers and intoxicated persons. It could have rationally thought that the establishment of an unquestioned and predictable yet limited basis for legal liability would provide a more effective incentive for the responsible furnishing of alcohol and the realization of the primary purpose. *See, e.g., Peters v. Saft,* 597 A.2d 50, 52–53 (Me.1991).

[¶ 63] The classifications are rationally related to the achievement of other legitimate secondary purposes as well. Alcohol providers are encouraged to provide alcohol lawfully, in compliance with the mandates of Title 12. Injured persons have the opportunity in all cases to be compensated by the intoxicated persons, and to be compensated in those cases in which the intoxicated person was unlawfully served. Underage persons are protected in the sense that alcohol pro-

viders are exposed to liability to third persons injured by unlawfully served underage persons; that exposure encourages alcohol providers not to unlawfully serve underage persons. Dependents and spouses of habitual drunkards are similarly protected in that same fashion. The legitimate purposes of deterrence, compensation, and regulation or cost-spreading, always present in the social justice system of tort law, are served in this legislation. Among the policy considerations enumerated in *Gates* and similar common law decisions of this Court, the foreseeability factor looms large. The legislature could have reasonably concluded that an alcohol provider cannot reasonably foresee the myriad ways in which any given intoxicated person might injure a third party. A motor vehicle accident is certainly one way, but, the legislature may have reasonably thought, more often than not an alcohol provider will not know by what means of transportation the customer arrived and will leave the licensed premises. However, the legislature may have reasonably thought, in the instance of an intoxicated person in a motor vehicle at the drive-in area, the alcohol provider would have a better opportunity to know that customer's means of transportation; therefore, the legislature drew a line and provided for liability if the alcohol provider furnished alcohol to that intoxicated drive-in customer.

[¶ 64] Another of the public policy factors which may have been reasonably considered by the legislature is the burden on the potential alcohol provider defendant. The defenders have satisfactorily addressed this policy factor. But we would add this. Justice Abrahamson, writing for a unanimous Wisconsin Supreme Court in *Doering*, 532 N.W.2d at 442–43, in which the court upheld that state's dramshop statute against an equal protection challenge much like the one we resolve today, posited that a legislature could reasonably conclude it places too difficult a task on the alcohol provider to determine when customers become intoxicated.

[¶ 65] We could continue, but we shall not. The points have been satisfactorily made. The equal protection safeguards of both the Federal and Wyoming constitutions do not require that the legislature draw its lines with mathematical certainty or even that it exercise its policy-making judgment in the best or wisest way. We hold that the legislative classifications at issue are rationally related to the legitimate legislative objectives of § 301.

[¶ 66] Having completed our rational-basis review, we hold that the Greenwalts have not demonstrated beyond a reasonable doubt that § 12–8–301 violates the equal protection guarantees of the United States and Wyoming Constitutions.

KITE, Justice, dissenting, with whom VOIGT, Justice, joins.

[¶ 67] I disagree with the majority's conclusion that Wyo. Stat. Ann. § 12–8–301 (LexisNexis 2001) does not violate the equal protection guarantee of the Wyoming Constitution. Were I writing the majority opinion, I would conclude the statute is unconstitutional because, contrary to the criteria for equal protection analysis to which this Court has long adhered, § 12–8–301 creates a classification which does not reflect a reasoned judgment consistent with the ideal of equal protection that is, it may not be fairly viewed as furthering a substantial interest of the state. *State v. Laude*, 654 P.2d 1223, 1226 (Wyo.1982). In reaching this conclusion, I find particularly significant the principle that, although courts have a duty to uphold the constitutionality of statutes if at all possible, *White v. Fisher*, 689 P.2d 102, 105 (Wyo. 1984), we do so only if it can be reasonably done. *Johnson v. State Hearing Examiner's Office*, 838 P.2d 158, 172 (Wyo.1992). It is equally imperative that we declare legislative enactments invalid when they transgress the Wyoming Constitution. *Hoem v. State*, 756 P.2d 780, 782 (Wyo.1988).

[¶ 68] I depart from the majority opinion because it attributes to *McClellan v. Tottenhoff*, 666 P.2d 408, 410–12 (Wyo.1983), a narrow holding not supported by a fair reading of the case. It proceeds from that narrow holding to conclude § 12–8–301 expands the common-law rights recognized in *McClellan*. In my view, a careful reading of *McClellan* leads to the conclusion that, rather than expanding common-law rights and responsibilities, § 12–8–301 as currently written severe-

ly limits those rights and responsibilities. From its narrow reading of *McClellan*, the majority goes on to conclude, contrary to established equal protection analysis, that the class harmed by the statute must be identified in the text of the statute itself. This is not correct under our prior case law or that of the United States Supreme Court, yet the majority relies on that incorrect premise in concluding the classification created by § 12–8–301 consists of liquor vendors who lawfully provide liquor versus liquor vendors who unlawfully provide liquor. From that conclusion, the majority further concludes the legislature's objective was to "create a comprehensive, yet simple-to-administer tort claim to cover all liquor providers and intoxicated persons" and the legislature "could have rationally thought that the establishment of an unquestioned and predictable yet limited basis for legal liability would provide a more effective incentive for the responsible furnishing of alcohol and the realization of the primary purpose." Maj. op. at ¶ 62. I do not agree with the narrow definition the majority attributes to the legislative classification created by § 12–8–301, nor do I agree that the classification, when identified in accordance with accepted equal protection analysis, is reasonably related to a legitimate state interest. In contrast to the majority's conclusion that the statute covers all liquor providers and intoxicated persons and the legislature rationally could have concluded the current law provides a more effective incentive for responsible liquor sales, the statute in my view clearly covers only liquor providers and intoxicated persons in the drive-in area and, for that reason, is not rationally based and provides no incentive for responsible liquor sales occurring outside the drive-in area, particularly sales *to intoxicated persons inside the drinking establishment.*

[¶ 69] In addition, proper equal protection analysis must include consideration of the impact of the statute on those not specifically addressed therein—those injured by intoxicated persons. In my view, the statute creates a class of victims—those injured by liquor providers who negligently serve intoxicated persons *within the establishment* (as

opposed to *in the drive-in area*)—which has no rational basis and no connection to a legitimate public interest. Of equal importance to my departure from the majority, the statute creates another classification by subjecting liquor vendors who negligently sell to intoxicated persons *in the drive-in area* to liability while shielding liquor vendors who negligently sell to intoxicated persons *inside the premises* from liability. No matter what gloss is applied, I can see no rational basis for drawing this distinction; in my view, it does not serve a legitimate state interest, and I would hold the statute unconstitutional.

## A. Historical Development of Dram–Shop Liability

[¶ 70] A historical review of the development of dram-shop liability [1] is relevant to a complete understanding of the current state of the law in Wyoming. Prior to 1983, a Wyoming alcohol vendor who negligently furnished alcohol to a customer was not liable for resulting injury. In *Parsons v. Jow*, 480 P.2d 396, 397 (Wyo.1971), *overruled by McClellan*, 666 P.2d 408, this Court stated: "We think it cannot be denied there was no cause of action at common law against a vendor of liquor in favor of one injured by a vendee who becomes intoxicated this for the reason that the proximate cause of injury was deemed to be the patron's consumption of liquor and not its sale." While this was the position adopted historically in most states, various courts began to question its propriety.

Until recently, dram shop law in America remained virtually unchanged from the English common law. Traditionally, dram shops were not held liable for damages sustained by third parties as a result of the conduct of an intoxicated patron to whom the alcohol was served. Although the traditional common law approach is still referred to and has often been followed by courts, an emerging trend ... has emerged, straying from common law principles by finding dram shops liable for

---

1. Black's Law Dictionary 509 (7th ed.1999) defines dram-shop liability as: "Civil liability of a commercial seller of alcoholic beverages for personal injury caused by an intoxicated customer."

damages to third parties caused by intoxicated patrons.

Brett T. Votava, Comment, *Missouri Dram Shop Liability: Last Call for Third Party Liability?*, 69 UMKC L.Rev. 587, 592 (2001).

[¶ 71] Consistent with this trend, this Court in 1983 rejected the common-law principles espoused in *Parsons* and recognized a cause of action against alcohol vendors based on common-law negligence principles. *McClellan*, 666 P.2d at 410–12. We challenged the use of *stare decisis* " 'as a justification for the continuance of an unfair and improper rule which operates to the detriment of those who may suffer tortious injury.' " *Id.* at 411 (quoting *Collins v. Memorial Hospital of Sheridan County*, 521 P.2d 1339, 1341 (Wyo.1974)). "We do not choose to stand by and wring our hands at the unfairness which we ourselves have created." *Id.* at 415. In support of our departure from the common law, we cited the existence of a possible causal connection between a vendor's conduct and a plaintiff's injuries:

"When alcoholic beverages are sold by a tavern keeper to a minor or to an intoxicated person, the unreasonable risk of harm not only to the minor or the intoxicated person but also to members of the traveling public may readily be recognized and foreseen; this is particularly evident in current times when traveling by car to and from the tavern is so common-place and accidents resulting from drinking are so frequent. [Citations.] . . ." *Rappaport v. Nichols*, . . . , [31 N.J. 188] 156 A.2d [1,] 8 [(N.J. 1959)].

The fact that the risk to the traveling public may readily be recognized and foreseen is supported by disturbing statistics. In 1977, the year when the statute forbidding sale of alcohol to minors and the statute forbidding sale of alcohol at a drive-in to minors or to intoxicated persons were recodified, there were 212 fatal vehicular accidents in Wyoming; 119, or over fifty percent, involved alcohol as a contributing circumstance.

*Id.* at 414–15.

[¶ 72] As further support for our departure from *Parsons*, we noted the following policy considerations:

Refusing to acknowledge a claim for relief against a liquor vendor harms society in two ways. First, it is an unjust doctrine which often limits recovery when an intoxicated minor driver injures someone. Businesses which sell liquor are usually in a more solid financial position than a minor. Second, it is reasonable to assume that the current state of the law places us all at more peril, because there is no effective deterrent to keep liquor vendors from selling liquor to minors or to intoxicated persons. Liquor licenses are seldom revoked. Perhaps the threat of civil liability or increased insurance premiums will serve to make liquor vendors more careful.

*Id.* at 415. We cited cases from other courts finding a cause of action against a liquor vendor based upon common-law negligence principles and concluding "a liquor vendor owes the same duty to the whole world as does any other person." *Id.* at 411. We said:

Once the general duty to use reasonable care is acknowledged, then courts focus their attention on the foreseeability of the resulting harm to establish proximate cause. We think this is a sensible and just approach. ***Henceforth, cases involving vendors of liquor and injured third parties will be approached in the same manner as other negligence cases.***

*Id.* (emphasis added). We recognized "a duty [on the part of liquor vendors] based both upon the common law and upon statutes." *Id.* at 414.

[¶ 73] We defined the common-law duty on the basis of ordinary negligence principles a liquor vendor owes a duty "to exercise the degree of care required of a reasonable person in light of all the circumstances." *Id.* at 411. We defined the statutory duty on the basis of § 12–5–301(a)(v), prohibiting the sale of alcohol in the drive-in area to minors or intoxicated persons, and § 12–6–101(a), making it a misdemeanor for anyone to furnish alcohol to a minor (except a legal ward, medical patient, or immediate family member). We held that the violation of either statute was evidence of negligence to be considered by the trier of fact together with other cir-

cumstances in determining liquor vendor negligence. *Id.* at 413.

[¶ 74] Addressing the issue of proximate cause, we held "the ultimate test concerning proximate cause will be whether the vendor could foresee injury to a third person. This question will be one of fact based on the circumstances of each particular case. It is, however, not necessary that a specific injury be foreseen." *Id.* at 414. Nowhere in the entirety of the opinion did we limit our holding to only those situations where a vendor sells intoxicating liquor to underage or intoxicated persons in the drive-in area. Contrary to the majority's conclusion that "one can confidently and reasonably conclude that the *McClellan* holding was narrow," Maj. op. at ¶ 13, it is clear this Court intended the holding to apply broadly. That is, we intended a complete abrogation of the common-law rule of nonliability in favor of the application of general negligence principles in cases alleging vendor liability.

[¶ 75] With an emerging trend of state court decisions attaching liability to dram shops, state legislatures responded by enacting statutes either authorizing or denying causes of action against dram shops. Votava, *supra,* 69 UMKC L.Rev. at 595–96. In 1985, just two years after our decision in *McClellan,* Wyoming followed suit and enacted § 12–8–301 which abrogated this Court's decision in *McClellan.* 1985 Wyo. Sess. Laws ch. 205, § 1. With the enactment of § 12–8–301, liquor vendor liability became strictly a creature of statute. The 1985 version of § 12–8–301 provided:

12–8–301. Limitation of liability.

(a) No licensee is liable for damages caused by an intoxicated person to whom the licensee legally sold or furnished alcoholic liquor or malt beverages unless the licensee sold or provided alcoholic liquor or malt beverages to a person who was intoxicated, and:

(i) It was reasonably apparent to the licensee that the person buying or receiving the alcoholic liquor or malt beverage was intoxicated; or

(ii) The licensee knew or reasonably should have known from the circumstances that the person buying or receiv-

ing the alcoholic liquor or malt beverages was intoxicated.

(b) No person who is not a licensee who has gratuitously and legally provided alcoholic liquor or malt beverage to any other person is liable for damages caused by the intoxication of the *other* person.

(c) This section does not affect the liability of the intoxicated person for damages.

(d) This section does not affect the liability of the licensee or person if the alcoholic liquor or malt beverage was sold or provided in violation of title 12 of the Wyoming statutes.

(e) For purposes of this section "licensee" *is as* defined in W.S. 12–1–101(a)(viii) and includes the licensee's employee or employees.

*Id.* In what appears to be an attempt to codify and clarify the common-law duties established in *McClellan,* the legislature limited liquor vendor liability to two situations. First, a liquor vendor could be liable if he furnished alcohol to an intoxicated person and either it was reasonably apparent to him the person was intoxicated or he knew or should have known the person was intoxicated. Second, a liquor vendor could be liable if he furnished alcohol in violation of Title 12 of the Wyoming Statutes. Title 12 set hours of operation for liquor vendors, prohibited the sale of alcohol in the drive-in area to minors or intoxicated persons, prohibited the sale of alcohol generally to minors, and contained various other restrictions and rules relating to the sale of alcohol. Like *McClellan,* § 12–8–301 as originally written broadly imposed liability on liquor vendors for sales occurring not only in the drive-in areas but whenever they knew or should have known the purchaser was intoxicated. Like *McClellan,* therefore, the original version of § 12–8–301 allowed for liquor vendor liability arising out of sales occurring inside a drinking establishment.

[¶ 76] One year later, in 1986, § 12–8–301 was amended to provide (changes are indicated throughout):

12–8–301. Limitation of liability.

(a) No licensee is liable for damages caused by an intoxicated person to whom the licensee legally sold or furnished alcoholic liquor or malt beverages unless the

~~licensee sold or provided alcoholic liquor or malt beverages to a person who was intoxicated, and:~~

~~(i) It was reasonably apparent to the licensee that the person buying or receiving the alcoholic liquor or malt beverage was intoxicated; or~~

~~(ii) The licensee knew or reasonably should have known from the circumstances that the person buying or receiving the alcoholic liquor or malt beverages was intoxicated.~~

~~(b)~~ *(a)* No person ~~who is not a licensee~~ who has ~~gratuitously and~~ legally provided alcoholic liquor or malt beverage to any other person is liable for damages caused by the intoxication of the other person.

~~(c)~~ *(b)* This section does not affect the liability of the intoxicated person for damages.

~~(d)~~ *(c)* This section does not affect the liability of the licensee or person if the alcoholic liquor or malt beverage was sold or provided in violation of title 12 of the Wyoming statutes.

~~(e)~~ *(d)* For purposes of this section "licensee" is as defined in W.S. 12–1–101(a)(viii) and includes the licensee's employee or employees.

1986 Wyo. Sess. Laws ch. 6, § 1. Under this version of the law, which remains in effect today, liquor vendors have complete immunity from civil liability unless they furnish alcohol in violation of Title 12. That is, liquor vendors are immune unless they furnish alcohol in a drive-in area to minors or intoxicated persons, otherwise furnish liquor to a minor, or violate some other provision of Title 12. Under the law as it currently reads, therefore, and in contrast to the law as it existed

under *McClellan* and the original statute, liquor vendors who furnish alcohol to intoxicated persons inside a liquor establishment are immune from liability for injuries occurring after the intoxicated person leaves the establishment—no matter what the circumstances. Clearly, § 12–8–301 as it currently reads does not broaden liquor vendor liability as the majority opinion concludes. Rather, the statute as amended severely limits liquor vendor liability.[2]

## B. Equal Protection Analysis

[¶ 77] The majority opinion concludes the classifications created by the statute do not violate the equal protection provisions of the Wyoming Constitution. The foundation for the equal protection guarantee is found in the following provisions of the Wyoming Constitution:

> In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal.

Wyo. Const. art. 1, § 2.

> Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction.

Wyo. Const. art. 1, § 3.

> All laws of a general nature shall have a uniform operation.

Wyo. Const. art. 1, § 34.

> The legislature shall not pass local or special laws in any of the following enu-

---

2. To better understand the positioning of § 12–8–301 in the continuum of dram-shop liability, it is instructive to examine the status of dram-shop law nationwide. Ten states have failed to enact dram-shop statutes: Delaware, Hawaii, Kansas, Maryland, Nebraska, Oklahoma, South Carolina, Virginia, Washington, and West Virginia. The courts in five of those states Hawaii, Oklahoma, South Carolina, Washington, and West Virginia currently hold dram shops liable for third-party damages. The courts of the remaining five states continue to follow the common-law rule holding dram shops are not liable for third-party injuries. Thirty-three states hold dram shops liable for alcohol sales to already intoxicated patrons or minors. Five states California, Florida, Louisi-

ana, North Carolina, and Wisconsin have enacted dram-shop liability for third parties in the event the dram shop improperly sold alcohol to a minor. Two states have made dram shops completely immune from civil liability Nevada and South Dakota. *See* Votava, *supra,* 69 UMKC L.Rev. at 596–604. Wyoming's statute is unique and grants alcohol providers complete immunity from liability for negligence unless they violate Title 12. *See* § 12–8–301. This background illustrates the wide statutory variations that exist state to state and further makes clear that such variations play a crucial role in determining whether a statute survives constitutional scrutiny.

merated cases, that is to say: For ... limitation of civil actions; ... granting to any corporation, association or individual ... any special or exclusive privilege, immunity or franchise whatever.... In all other cases where a general law can be made applicable no special law shall be enacted.

Wyo. Const. art. 3, § 27. *See also Mills v. Reynolds,* 837 P.2d 48, 52–53 (Wyo.1992). Article 3, Section 27 of the Wyoming Constitution specifically limits legislative .authority in several enumerated instances. Robert B. Keiter & Tim Newcomb, The Wyoming State Constitution, A Reference Guide (1993). We have said that Article 3, Section 27, which prohibits special laws, "means only that the statute must operate alike upon all persons in the same circumstances." *Meyer v. Kendig,* 641 P.2d 1235, 1240 (Wyo.1982); *see also Mountain Fuel Supply Company v. Emerson,* 578 P.2d 1351, 1356 (Wyo.1978). We have also noted that the prohibition against special laws contained in Article 3, Section 27 is a more specific equal protection guarantee that enlarges the protections of Article 1, Section 34 of the Wyoming Constitution. *Phillips v. ABC Builders, Inc.,* 611 P.2d 821, 826 (Wyo.1980). The extent and interdependency of the various Wyoming constitutional provisions guaranteeing the right to equal protection demand that the judiciary carefully examine legislation claimed to violate that right. Robert B. Keiter, *An Essay on Wyoming Constitutional Interpretation,* 21 Land & Water L.Rev. 527, 556 (1986).

> The five separate state constitutional provisions that impose due process-like and equal protection-like limitations on state legislative power, read in conjunction with article 3, section 27 which specifically limits legislative power, might be construed as evidence that the Wyoming framers intended the judiciary to exercise more of a checking function over the legislature than might be inferred in the federal Constitution.

*Id.* In fact, this Court has long recognized, "the Wyoming Constitution offers more robust protection against legal discrimination than the federal constitution." *Allhusen v. State By and Through Wyoming Mental Health Professions Licensing Board,* 898 P.2d 878, 884 (Wyo.1995).

[¶ 78] Perhaps in no other circumstance is the balance between the legislative and judicial functions more delicate than in the realm of equal protection. Although in general the equal protection guarantee mandates that all persons similarly situated shall be treated alike both in the privileges conferred and in the liabilities imposed, *Mills,* 837 P.2d at 53, the constitutional provisions at issue do not prohibit legislatively created classifications. In fact, the very foundation of the legislative function is to establish differing legal obligations for different circumstances and persons in the process of furthering the public interest.

> Here, then, is a paradox: The equal protection of the laws is a "pledge of the protection of equal laws." But laws may classify. And "the very idea of classification is that of inequality." In tackling this paradox the [United States Supreme] Court has neither abandoned the demand for equality nor denied the legislative right to classify. It has taken a middle course. It has resolved the contradictory demands of legislative specialization and constitutional generality by a doctrine of reasonable classification.

Joseph Tussman & Jacobus tenBroek, *The Equal Protection of the Laws,* 37 Cal. L.Rev. 341, 344 (1949). The measure of reasonableness of a classification is the degree of its success in treating similarly those similarly situated with respect to the purpose of the law. *Id.* at 344, 346.

[¶ 79] The process of testing legislative classifications is founded upon determining the legitimate legislative purpose "at which legislation must aim." *Id.* at 350. In performing this function of judicial review of legislative action, we must exercise "judicial statesmanship" by appreciating the political pressures and practical considerations that naturally exist in the legislative process. *Id.* at 351. But in doing so, we cannot ignore reason and logic in the name of judicial restraint, and, most importantly, we must act to protect the intent of the framers of our constitution and the paramount value they placed upon equal protection of the law.

While it clearly is not our function to substitute our view about what is desirable for that of the legislature, "self-restraint is no virtue if the Court has a unique function to perform." *Id.* at 366.

[¶ 80] We want to make it clear:

Before testing the classifications herein presented we caution that our constitutional inquiry does not seek to determine whether the [statute at issue is] wise, sound, necessary, or in the public interest. There are ample reasons for concluding otherwise. We simply ask whether the legislation adopted, for whatever purposes disclosed or undisclosed, is reasonably supportable. Each day the devastating effects of the drinking driver rage unabated with all of their tragic social and economic consequences. We do not speculate on the influences that might have prompted the Legislature to answer this acute and growing problem by narrowly *restricting* rather than *enlarging* civil liability. In the final analysis the Legislature must answer to an informed, and perhaps ultimately aroused, public opinion for its action. We do not substitute our judgment for its own.

*Cory v. Shierloh,* 29 Cal.3d 430, 174 Cal.Rptr. 500, 629 P.2d 8, 12 (1981) (citation omitted).

[¶ 81] I agree with the majority opinion that § 12–8–301 does not infringe upon the fundamental right of access to the courts or any other fundamental interest, nor does it create an inherently suspect class. Consequently, I agree that the statute must be reviewed under the rational basis test. That test, as we have said, requires us to determine whether the classification created by § 12–8–301 bears a rationale relationship to a legitimate state concern. *See generally Allhusen,* 898 P.2d at 885–86; *Johnson,* 838 P.2d at 166–67.

[¶ 82] The equal protection guarantee of the Wyoming Constitution was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. *Laude,* 654 P.2d at 1226. Even at its lowest scrutiny level—rational basis—the Wyoming Constitution provides greater protection against legal discrimination than the federal constitution does. *Johnson,* 838 P.2d at 165. The rational basis test, although a deferential

standard of review, is not a toothless one. *Id.* at 172.

[¶ 83] Like the federal constitution, the Wyoming Constitution does not prohibit legislative classification. It does, however, require that the classification be reasonably related to a legitimate legislative purpose. Where such a relationship is nonexistent, the statute must be held to contravene the constitution. *Phillips,* 611 P.2d at 826.

[T]here must be some difference which furnishes a reasonable basis for different legislation as to different classes, and the differences must not be arbitrary and without just relation to the subject of the legislation. One who assails a classification must carry the burden of showing that it does not rest on a reasonable basis, but is essentially arbitrary.

*Mountain Fuel Supply Company,* 578 P.2d at 1354–55 (citations omitted). In a number of instances, we have struck down legislation that did not pass constitutional muster under the rational basis test. *Nehring v. Russell,* 582 P.2d 67 (Wyo.1978) (holding state automobile guest statute violated the state equal protection provision by distinguishing between paying and nonpaying guest passengers respecting their right to sue for injuries sustained as a result of the driver's negligence); *Phillips,* 611 P.2d 821 (holding ten-year limitation violated the equal protection guarantee because it immunized certain defendants from liability arising from their involvement in real property improvements); *Hoem,* 756 P.2d 780 (finding Wyoming Medical Review Panel Act was unconstitutional because it violated the equal protection clause of the Wyoming Constitution); *State ex rel. Wyoming Association of Consulting Engineers and Land Surveyors v. Sullivan,* 798 P.2d 826 (Wyo.1990) (finding Wyoming Professional Review Panel Act violated the equal protection guarantees of the Wyoming Constitution); *Johnson,* 838 P.2d 158 (finding statute providing for loss of driver's license based on age was unconstitutional special legislation lacking rational differentiation and violating the equal protection guarantees); *Allhusen,* 898 P.2d 878 (holding certain licensure provisions violated the equal protection guarantees by affording disparate treatment

of unlicensed counselors employed by private, for profit institutions).

[¶ 84] In *Johnson*, we outlined the four elements of the test to be applied in determining whether statutory classifications violate equal protection provisions of the Wyoming Constitution: (1) what class is harmed by the legislation and has the group been subjected to a tradition of disfavor by our laws, (2) what is the public service to be served by the law, (3) what is the characteristic of the disadvantaged class that justifies disparate treatment, and (4) how are the characteristics used to distinguish people for disparate treatment relevant to the purpose the challenged law purportedly intends to serve. 838 P.2d at 166–67. Each of the four elements must be applied in determining whether the classifications created by § 12–8–301 violate the equal protection provisions.

### 1. Class harmed by the legislative classification

[¶ 85] In reaching the result it does, the majority relies heavily on the assertion that the classification must be identified within the text of the challenged statute. This assertion is incorrect. Under proper equal protection analysis, a classification can be established one of three ways:

First, a law may establish a classification on its face requiring no proof of the classification other than the language of the statute itself. Second, a law, which on its face shows no impermissible classification, may be impermissibly applied in varying degrees to different identifiable classes of individuals. When application of a law is at issue, proof beyond the language of the law is required to establish the classification that is challenged. Finally, a law that neither classifies on its face nor is applied unevenly may nonetheless be shown by outside proof to in reality constitute "a device designed to impose different burdens on different classes of persons." Nowak, Rotunda, and Young, Constitutional Law, ch. 16 at 527 (1978).

*Laude*, 654 P.2d at 1226. Thus, a classification can be shown: (1) from the language of the statute itself, (2) by the manner in which the statute is applied, *or* (3) by outside proof

that the statute in fact is designed to impose different burdens on different classes of people. The statute at issue creates impermissible classifications in all three ways. On its face, as applied and as shown by outside proof, § 12–8–301 specifically treats individuals injured as a result of liquor vendor negligence occurring in the drive-in area differently than those injured as a result of inside-the-premises liquor vendor negligence. On its face, as applied and as shown by outside proof, the statute also treats liquor vendors who negligently sell in the drive-in area differently than other liquor vendors. The end result of the classifications is that liquor vendors may be accountable for furnishing liquor to an intoxicated person *in a drive-in area* but cannot be held accountable for furnishing liquor to the same intoxicated person *inside the premises.* To the same effect, an injured victim has no right to recover if the intoxicated person was served *inside the premises* but can recover if the person was served *in the drive-in area.* Stated differently, a person injured by an intoxicated person who was negligently provided alcohol in a drive-in area has the right to seek a portion of his damages from the alcohol provider, whereas a person injured by the same intoxicated person who was served negligently inside the establishment does not.

[¶ 86] The majority attempts to avoid this result by looking at only the face of the statute, drawing the classification narrowly by looking exclusively at liquor vendors, and ignoring the classes harmed by the statute. This is not proper equal protection analysis under our precedent, which requires consideration of the class harmed by the legislation. *Johnson*, 838 P.2d at 166. Narrow formulation of a statutory classification does not avoid the requirements of the equal protection clause. *See generally* Tussman & tenBroek, *supra*, 37 Cal. L.Rev. at 346–351, 360.

[¶ 87] In *Hoem*, we considered a similar classification of tort victims who had their right to recover for negligence diminished medical malpractice tort victims. We held a statute creating the Wyoming Medical Review Panel Act violated those victims' equal protection rights. The act created a panel to review all medical malpractice claims against

health care providers before such claims could be pursued in court. 756 P.2d at 782. The plaintiff in *Hoem* argued the act treated medical malpractice victims differently than those injured by the tortious conduct of someone other than a health care provider in that only medical malpractice victims were prohibited from filing a claim directly in court for personal injury. *Id.* Ultimately, we held the Wyoming Medical Review Panel Act denied medical malpractice victims equal protection of the law. *Id.* at 784. Our review revealed the legislature's purpose was to reduce the number of medical malpractice lawsuits and lower insurance rates. *Id.* at 783. Although we agreed the legislature had a legitimate interest in protecting the health of the citizens of Wyoming as well as the economic and social stability of the state, we held: "It cannot seriously be contended that the extension of special benefits to the medical profession and the imposition of an additional hurdle in the path of medical malpractice victims relate to the protection of the public health." *Id.* We have reviewed similar statutes by focusing on the classification of tort victims created. *See Mills,* 837 P.2d at 53; *Hoem,* 756 P.2d at 783; *Nehring,* 582 P.2d at 77.

[¶ 88] In *Hoem,* this Court made it clear that the equal protection violation was found in the disparity in treatment of injured persons, some of whom were required to submit their cases to the medical review panel while others did not encounter that impediment in pursuing their claims. We said: "We cannot condone the legislature's use of the law to protect one class of people from financial difficulties while it dilutes the rights under the constitution of another class of people." *Hoem,* 756 P.2d at 784. As with the statute we struck down in *Hoem,* § 12–8–301 results in disparity in treatment in that it protects one class of people (liquor vendors who negligently sell to intoxicated persons inside the liquor establishment) while diluting the rights of another class of people (those injured as a result of the negligent sale inside the premises).

## 2. Legislative objectives

[¶ 89] Having identified the class harmed by the legislation, we must determine what public purpose the law serves. As is oftentimes the reality in Wyoming, there is a dearth of evidence of legislative intent regarding this statute. The legislature did not expressly articulate the purpose of § 12–8–301, as it did with the Wyoming Medical Review Panel Act, or the relation between the classification in the statute and its purpose. However, when the legislative purpose is not explicit, courts are free to infer the purpose. Tussman & tenBroek, *supra,* 37 Cal. L.Rev. at 366. · It can be safely inferred the purpose of § 12–8–301, located in Title 12 which is entitled Alcoholic Beverages, is to protect the public. A statute which purports to "limit liability" in all but illegal circumstances could arguably be intended to encourage compliance with that law, thus promoting public safety. The Greenwalts assert the legislative objective was to protect the financial interests of liquor vendors and their liability insurers. Rejecting that contention, the majority states:

Having read the definite written words of § 301 and the other pertinent provisions of Title 12, having considered the general public knowledge about the evils attending the sale and furnishing of intoxicating liquors to our state's citizens, and having considered the prior common law decisions and statutory law, we can confidently conclude that the legislative objective of § 301 is unmistakably what the defenders of that law have identified: a comprehensive statutory tort claim affecting liquor providers (both licensee and nonlicensees), intoxicated customers/guests of all liquor providers, and third parties who are damaged by intoxicated customers/guests.

Maj. op. at ¶ 51.

[¶ 90] Without an expressly stated legislative purpose, all these characterizations of the legislative purpose require some degree of speculation. However, each characterization ultimately relates to protection of the public and public safety.

## 3. Rational relationship between legislative classification and objective

[¶ 91] Having identified the class harmed by the legislation and the public purpose of

the statute, we must examine the characteristic of the disadvantaged class justifying the disparate treatment and how that is relevant to the statute's purpose. In other words, is there a rational relationship between the purpose of the statute and a characteristic of the class harmed by the legislation? The fatal flaw in Wyoming's dram-shop statute appears in the final step of the *Johnson* test particularly because a reviewing court is no longer free to imagine any set of facts which could make the statute appear constitutional. *Johnson,* 838 P.2d at 167. Can it be argued that preventing a tort victim from seeking damages for a negligent alcohol provider's share of responsibility is rationally related to protection of the public? I struggle to see the connection. It may be true that subjecting violators of Title 12 to liability encourages compliance with § 12–8–301. However, it does not logically follow that granting immunity to negligent alcohol providers who comply with Title 12 will somehow promote public safety. Under the statute, an alcohol provider may be motivated to diligently comply with each Title 12 requirement to avoid liability, such as refusing to serve minors or intoxicated persons in drive-in areas, observing mandatory hours of operation, and following the myriad of other Title 12 requirements. Yet, under § 12–8–301 the same alcohol provider has no legal incentive to refrain from serving more alcohol to an already intoxicated individual inside the establishment. Both *McClellan* and the 1985 statute had the effect of encouraging compliance with Title 12 by holding all persons liable who illegally provided alcohol while also protecting the public by imposing that same liability on licensees who failed to exercise reasonable care in serving alcohol to intoxicated persons inside the establishment. Viewed from this perspective, it is difficult to imagine how § 12–8–301 is rationally related to a legitimate state interest. This is particularly true in light of the fact that the statute significantly curtails both the rights of tort victims and the responsibilities of liquor vendors as those rights and responsibilities existed after *McClellan* and prior to the 1986 amendment to § 12–8–301.

[¶ 92] When an intoxicated individual leaves the provider's premises, the public is in danger. Usually, but not always, the heightened risk of harm to the public results from alcohol-related traffic accidents that are tragic and foreseeable events, evident in alarming statistics. Regrettably, accidents involving intoxicated drivers in Wyoming are commonplace. In 1986, the year the legislature enacted § 12–8–301, there were 146 fatal vehicular accidents in Wyoming. *Wyoming's Comprehensive Report on Traffic Accidents,* Wyoming Highway Department, Highway Safety Branch, Accident Data Management Section at 149 (1986). Seventy-one vehicular accidents, or 48.6 percent of all vehicular accidents which resulted in death that year, were alcohol-related. *Id.* These statistics fail to account for the many people who had injuries that resulted from alcohol-related traffic accidents but did not result in death. It is also important to note that, although the most obvious public safety concern is drinking and driving, intoxicated persons pose many other types of risks to third persons that do not involve the use of a motor vehicle. Public safety cannot be enhanced by excusing alcohol providers from the same duty owed by all other persons acting reasonably under the circumstances. Therefore, the classification of tort victims created by § 12–8–301 is not rationally related to the apparent purpose of the statute protection of the public.

[¶ 93] In prior cases where this Court has found statutory classifications were not rationally related to the legislative objective, we have not hesitated to declare the statute at issue unconstitutional on equal protection grounds. In *Nehring,* 582 P.2d 67, we held the automobile guest statute violated the equal protection provisions by distinguishing between paying and nonpaying guest passengers with regard to their right to sue for injuries as a result of a driver's negligence. While we recognized the legitimate legislative objective of promoting hospitality by generous drivers, we questioned whether the classification prescribed by statute had a rational relation to that objective. 582 P.2d at 78. We quoted the New Mexico Supreme Court to expose the basic flaw in the relationship:

"The classification fails not because it draws some distinction between paying and nonpaying guests, but because it penalizes nonpaying guests by depriving them completely of protection from ordinary negligence.... No matter how laudable the State's interest in promoting hospitality, it is irrational to reward generosity by allowing the host to abandon ordinary care and by denying to nonpaying guests the common law remedy for negligently inflicted injury."

*Id.* (quoting *McGeehan v. Bunch,* 88 N.M. 308, 540 P.2d 238, 241 (1975)). We held the guest statute exceeded all bounds of rationality and constituted a denial of uniform operation under the Wyoming Constitution. *Id.* at 79.

[¶ 94] In *Phillips,* 611 P.2d 821, we struck down a ten-year statute of limitation that immunized a class of defendants from certain enumerated liabilities arising from their involvement in real property improvements. The statute had the effect of granting a special immunity to architects and contractors. 611 P.2d at 825. Conversely, it limited a specific class of plaintiffs from full recovery—those who suffered damages as a result of the negligence of an architect or contractor. " 'The arbitrary quality of the statute clearly appears when we consider that architects and contractors are not the only persons whose negligence in the construction of a building or other improvement may cause damage to property or injury to persons.' " *Id.* (quoting *Skinner v. Anderson,* 38 Ill.2d 455, 231 N.E.2d 588, 591 (1967)). " 'That the statute benefits all architects and construction contractors is significant only if the benefits conferred upon them are not denied to others similarly situated.' " *Id.* at 826 (quoting *Skinner,* 231 N.E.2d at 591). We held in part that the statute granted immunity from suit for only a narrow spectrum of defendants in violation of the equal protection provisions. *Id.* at 831.

[¶ 95] Here, the majority concludes the legislature could rationally have thought the classification requiring an injured third party to look to only the intoxicated adult for compensation promotes individual responsibility on the part of those who choose to drink and drive or otherwise abuse alcohol and, in that manner, protects the public. The majority insists the legislature properly could have concluded that to do otherwise would impose an unacceptable burden upon the alcohol provider to recognize its customer is intoxicated and to foresee that a customer may drink and drive. This assertion is fallacious for several reasons. First, it can be presumed, in a great majority of the circumstances, a jury will consider proximate cause and place liability squarely on the shoulders of the intoxicated person. Second, the legislature imposed responsibility on the alcohol provider to determine whether its drive-in customer is intoxicated, a much more difficult task given the attenuated nature of the contact with that person not being able to observe the volume of alcohol previously consumed or the typical behaviors accompanying intoxication. *See* § 12–5–301(a)(v) (forbids the furnishing of alcohol to an intoxicated person in the drive-in area). It is, at best, questionable whether serving alcohol to an intoxicated customer in the drive-in area poses any greater danger to the public than serving an intoxicated person inside the premises. This is particularly true considering the intoxicated person must only be in the drive-in area and thus may not necessarily be driving a vehicle. Finally, to support the conclusion that imposing the alcohol provider's share of liability on the intoxicated person will act as a deterrent and encourage personal responsibility on the part of the intoxicated person thereby assisting in protecting the public, this Court must agree that an already intoxicated customer is cognizant of the statute's effect and has the capacity to conclude he should refrain from further alcohol consumption to avoid assuming more than his personal share of responsibility for injuries he may cause upon leaving the establishment. It is difficult to imagine a more illogical conclusion. As between an intoxicated patron and a licensed alcohol provider, no doubt exists as to who has the greater capacity to control whether more alcohol is consumed and is in fact capable of exercising personal responsibility.

[¶ 96] I also question whether "individual responsibility" was the legislative objective behind the dram-shop statute because it is directly contrary to the policy underlying

Wyoming's comparative negligence statute in which the legislature chose to allocate the consequences to all those with fault. In 1986, the Wyoming legislature abolished joint and several liability by amending § 1–1–109 to provide that a party at fault be required to pay for his proportionate share of the fault. 1986 Wyo. Sess. Laws ch. 24, § 1; *Haderlie v. Sondgeroth,* 866 P.2d 703, 708 (Wyo.1993). The adoption of comparative fault mandates that the trier of fact determine issues of proximate cause and allocate liability accordingly. In a comparative fault case, the jury must consider the negligence of not only the parties but also all the participants in the transaction producing the injuries sued upon.[3] *Board of County Commissioners of County of Campbell v. Ridenour,* 623 P.2d 1174, 1191 (Wyo.1981).

[¶ 97] Instead of promoting individual responsibility, the current version of § 12–8–301 excuses an alcohol provider from responsibility for its own negligence by precluding recovery for its proportion of fault when it acts legally but fails to exercise the degree of care required of a reasonable person in light of all the circumstances. Try as I might, I can find no rational basis to distinguish between victims injured by persons illegally served alcohol or intoxicated persons served in a drive-in area and those injured due in part to the negligence of a person serving an obviously intoxicated adult inside an establishment.

[¶ 98] The Greenwalts suggest the true legislative purpose of § 12–8–301 is to protect alcohol vendors from the expense of liability insurance to cover their potential negligence. Lacking any indication in the legislative history of the intent of the body as a whole, we are offered evidence of the intent of the sponsor of the legislation which would suggest that, at least, to be his purpose.[4] However, we cannot consider the intent of one legislator as reflecting the intent of the legislature as a whole. *Independent Producers Marketing Corp. v. Cobb,* 721 P.2d 1106, 1108 (Wyo.1986). Obviously, if the Greenwalts' contention were true, it would not constitute a legitimate legislative purpose and would raise other constitutional issues such as the prohibition in Article 3, Section 27 of the Wyoming Constitution against special laws granting exclusive immunity to corporations or individuals. Having found the medical profession was not entitled to such preferential treatment, we certainly should not find alcohol providers are entitled to it. *Hoem,* 756 P.2d at 783.

[¶ 99] I am fully cognizant of the deference we are required to give the legislature and our obligation not to encroach into the legislative field of policy making. However, it is likewise this Court's duty to declare unconstitutional statutes that clearly violate Wyoming's constitutional mandates. *Painter v. Abels,* 998 P.2d 931, 939 (Wyo.2000). Even with considerable effort, I can find no rational relationship between this statute and a legitimate state concern. Following the rationale of our longstanding equal protection jurisprudence, I would find the Greenwalts have carried their burden of proof that the dram-shop statute creates classifications of tort victims and tortfeasors without furthering a legitimate state interest.

---

**3.** Uncertainty exists as to whether an immune party would be placed on the verdict form.

**4.** In 1986, a representative sponsored the amendment to § 12–8–301. The representative sent a letter to the Wyoming Legislative Service Office stating in pertinent part, "I have enclosed extremely rough drafts of proposed legislation dealing with the *liability insurance issue.*" (Emphasis added.)